Richard O. HARRIS, Individually and As Trustee of Richard O. Harris Profit Sharing Trust, Appellant,

v.

Richard K. ARCHER, M.D., Individually and As Trustee of the Richard K. Archer, M.D., P.A. Profit Sharing Plan & Trust and Reba Land, Inc., Appellees and Cross–Appellants

v.

Steve W. Sterquell, Individually and As Trustee of Steve W. Sterquell Profit Sharing Trust, Cross–Appellees.

No. 07–01–0071–CV.

Court of Appeals of Texas, Amarillo.

Jan. 29, 2004.

Rehearing Overruled Feb. 20, 2004.

John Smithee, Templeton Smithee Hayes Heinrich & Russell, L.L.P., Amarillo, for appellant.

George Whittenburg, Whittenburg Whittenburg & Schachter P.C., and David Allison, Amarillo, for appellee.

Before JOHNSON, C.J., and QUINN, J., and BOYD, S.J.[1]

## OPINION ON MOTION FOR REHEARING

PHIL JOHNSON, Chief Justice.

We overrule the Motion for Rehearing of Richard K. Archer, M.D., Individually and as Trustee of the Richard K. Archer Profit Sharing Trust and Reba Land, Inc. We withdraw our prior opinion and issue this opinion in its place. Although Sterq-uell and Harris have remitted damages pursuant to the suggestion in our prior opinion, this opinion repeats the language suggesting remittitur for purposes of coherence and structural continuity.

Richard O. Harris, Individually and as Trustee of the Richard O. Harris Profit Sharing Trust (collectively "Harris" unless otherwise noted)[2] appeals from a take-nothing judgment in favor of Richard K. Archer, Individually and as Trustee of the Richard K. Archer, M.D., P.A. Profit Sharing Plan and Trust (collectively "Archer" or "Richard" unless otherwise noted) and Reba Land, Inc. ("Reba"). Archer and Reba appeal from a judgment in favor of Steve W. Sterquell, individually and as Trustee of the Steve W. Sterquell Profit Sharing Trust (collectively "Sterquell" unless otherwise noted), and also urge that the judgment as to Harris be affirmed. Alternatively, Archer and Reba seek judgment requiring Harris and Sterquell to remit exemplary damages. We conditionally affirm as to Sterquell. We reverse as to Harris, and conditionally grant judgment for Harris.

## I. BACKGROUND

### A. Procedural Background

In early 1993, Steve W. Sterquell, Richard O. Harris, and Dr. Richard K. Archer formed a partnership for the purpose of purchasing a building near the Amarillo airport (the "airport building"). The agreement was that their profit sharing trusts ("PSTs") would be equal partners in the partnership. The building was purchased as partnership property. On July 1, 1994, the parties entered into two agree-

---

1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment.

2. For purposes of brevity, we will on occasion refer to Harris, Archer, and Sterquell in their individual capacities without so noting. We will rely on the context to indicate the capacities in such instances. When it is important to distinguish their individual actions from their actions as trustees, we will specifically so note.

ments settling all claims against each other and resulting in transfer of the partnership interests of Sterquell and Harris to Archer. Several days later Archer sold the airport building for over $300,000 profit. Sterquell and Harris sued Archer claiming that he defrauded them by failing to disclose his negotiations in June, 1994, to sell the building. Following a jury trial, judgment was entered in favor of Sterquell for actual and exemplary damages; a take-nothing judgment NOV was entered as to Harris. Harris appeals the take-nothing judgment. Archer and Reba appeal the judgment in favor of Sterquell.

This is the second appeal in this matter. *See Sterquell v. Archer,* No. 07–96–0218–CV; 1997 WL 20881 (Amarillo Jan. 17, 1997, writ denied) (not designated for publication). The nature of the case and appellate issues necessitates our repeating some of the facts and matters recited in our prior opinion.[3]

### B. Factual Background

In November, 1991, Sterquell was looking to borrow money to complete a transaction in low-income housing units which would generate federal income tax credits. Through a third party, Sterquell met with Harris, who was a retired banker. Harris was, in part, involved in arranging loans in exchange for payment of finder's fees. Harris arranged for Archer to lend money to Sterquell for the low-income housing transaction. The transaction worked out successfully and Archer's loan was repaid. In 1992 and 1993 Sterquell and Archer made attempts to enter into other investment transactions together: some attempts were fruitful; some attempts were not fruitful. Most attempts involved at least some aspect of tax-advantaged properties, tax-credit-yielding investments, and either partnerships or corporations. Sterquell was compensated for his work as an accountant in connection with some of the proposed transactions, and also received fees for putting some of the transactions together. Archer's legal work in regard to the transactions was typically via attorney Jack Hazlewood, who was married to Archer's sister. Archer's then-accountant son-in-law, David Allison, was involved on behalf of Archer in regard to accounting matters.

Sometime in late 1992, Sterquell discovered that the airport building was going to be put up for sale. He made inquiries, determined the sales price, and concluded that the building was attractive as an investment. Because he did not have enough money to do the transaction by himself, he contacted Harris and Archer about the matter. The three decided to purchase the building as an investment via a partnership in which the profit sharing trusts of the three men would be equal partners.

Following the initial agreement to enter into a partnership, Archer executed a purchase contract dated February 18, 1993, on behalf of Airport Building, L.L.P., for purchase of the airport building. The purchase price was $185,000.

A written partnership agreement for the Airport Building, L.L.P. partnership (the "partnership") was executed with the PSTs as partners, acting through Sterquell, Harris, and Archer, each acting as trustee of his respective PST. The written partnership agreement was not dated, but it recited that the partnership was to commence on March 1, 1993. An application for lim-

---

**3.** Our prior opinion sets out certain facts reflected by the summary judgment proof in the record as then presented. We recognize that some of the facts presented by summary judgment proof may seem to vary from facts established by or which are inferred from trial evidence as noted in this opinion.

ited liability partnership status was dated March 1, 1993. Among other provisions, the written partnership agreement contained a section restricting transfers of partnership interests:

18. Except as otherwise provided in this Agreement, no Partner may sell, assign, transfer, encumber or otherwise dispose of any Partnership interest without the prior written consent of the other Partners, and may not pass title to any Partnership interest in the absence of such consent. Any transfer prohibited under this paragraph shall be void.

In May, 1993, the partnership's purchase of the airport building closed. Archer, individually, signed a promissory note for the full purchase price of $185,000. The building was deeded to the partnership, and a deed of trust to secure the note was executed on behalf of each of the PSTs as partners.

On November 30, 1993, Harris called Archer and reported that Sterquell was not the kind of person with whom Harris and Archer should be in business. Archer's recollection of the conversation was that Harris called Sterquell a crook and made other similar accusations.

By December, 1993, Branch Archer, Richard's brother, had expressed an interest in the airport building to Richard. Branch, however, was interested only in the real estate, not in the limited liability partnership. Nor did Branch want to be partners with anyone but his brother Richard; that is, Branch was interested in buying out both Harris's interest and Sterquell's interest in the airport building, or neither interest. Branch was present in Richard's office in December, 1993, during a telephone conversation between Richard

Archer and Harris. Richard told Harris of Branch's interest in buying the parts of the airport building that were owned by Harris and Sterquell.

Richard Archer was responsible for keeping the partnership books. He accomplished the accounting, in part, through a business operated by his son-in-law, David Allison. During a meeting between Sterquell and Allison in early December, the possible sale of Harris's and Sterquell's interests in the partnership was discussed. Without the prior written consent of Sterquell or Richard Archer, Harris agreed to sell his interest to Branch Archer for $10,000, less expenses owed to the partnership for past operations. Branch Archer wrote a check to Harris for the net purchase amount and Richard Archer forwarded the check to Harris. On December 22, 1993, Harris signed documents transferring his interest to Randall Kubiak as trustee. Harris left his check and the documents with Richard with a note stating that the documents should be held until Sterquell signed the necessary documents. In January, Richard Archer urged Harris to cash the check from Branch, and Harris did so. Sterquell, however, did not sign documents of sale. Instead, Sterquell wrote a letter to Allison and Harris dated January 3, 1994,[4] stating that the Sterquell trust wanted to retain its ownership position in the partnership; the Sterquell trust desired to acquire the Harris interest in the "property being sold"; the Sterquell trust would be willing to purchase the Archer interest in the property on the same terms; and that the Sterquell trust would close the transaction in January, 1994, and would pay off the debt on the property. By a separate letter to David Allison dated January 4, 1994,

---

4. The letter was dated January 3, 1993. No one contended, however, that the correct date

was not actually January 3, 1994.

Sterquell (1) declined to sell the Sterquell interest in the partnership to a partnership composed of Branch Archer and Richard Archer, (2) offered to purchase one-half of Harris's interest and have Richard Archer purchase the other half, or (3) purchase Richard Archer's partnership interest and pay off the purchase money mortgage. Then, by letter dated January 7, 1994, to Allison, Sterquell recited an agreement with Richard Archer and Harris that (1) Sterquell had the "opportunity to purchase Richard's interest and [Harris's] interest at the same terms" and pay the mortgage on the building, and (2) if Sterquell did not complete the purchase transaction by the end of January, Richard Archer would "have the same option to purchase mine and [Harris's] interest after the end of January." Sterquell testified at trial that the "same option" as set out in his letter was a thirty-day opportunity for Archer to purchase the interests of Harris and Sterquell.

Sterquell did not complete the purchase of the Harris and Archer interests in January. By letter to Sterquell dated February 19, 1994, Harris noted that Sterquell had not purchased the Archer and Harris interests in the airport building project, Harris considered Sterquell's deal off, and Harris was trying to sell his 1/3 interest to Richard Archer. Richard Archer did not contend that he purchased Harris's interest after Sterquell's January 7th letter, but before July 1, 1994.

At trial, Branch Archer[5] and Richard Archer testified that in April, 1994, Branch became aware that Sterquell had a pending bankruptcy proceeding. Branch immediately reported the fact to Richard. As it turned out, Sterquell, individually, had filed for Chapter 11 bankruptcy in 1991. The proceeding was ongoing through the formation and initial stages of the partnership. The bankruptcy proceeding was dismissed in April, 1994. Sterquell's PST was listed as an exempt asset in the bankruptcy proceeding.

The evidence reflects no attempts to sell or transfer any partnership interest or the airport building itself between Harris's letter of February 19th, and late June, 1994. In late June, the Amarillo Economic Development Corporation ("AEDC") and Richard Archer entered into negotiations for sale of the airport building to the AEDC. The negotiations culminated in an offer by the AEDC to purchase the building for approximately $500,000.

Archer told the AEDC representative that there were other owners of the building and that Archer believed they would agree to sell the building. Instead of advising Sterquell and Harris of his negotiations and discussing a sale of the building with them, however, Archer consulted his attorney, Hazlewood. Archer and Hazlewood discussed whether Archer had an obligation to tell Sterquell and Harris of the AEDC negotiations. Archer told Hazlewood that Sterquell and Harris had agreed to sell their interests in December and that the agreements were not consummated. He did not disclose to Hazlewood that the partnership agreement contained a clause making sale of a partner's interest void if prior written approval of the other partners was not obtained. Hazlewood did not read the partnership agreement, but nevertheless drafted an agreement by which Archer would purchase the interests of Sterquell and Harris in the airport building partnership as part of settling all accounts and claims pending among the parties. The agreement contained a recitation that in December, 1993, negotiations had taken place for sale of Sterquell's interest in the partnership to Archer's PST,

5. Branch Archer died before trial. His testimony was by deposition.

and that an agreement had been reached for sale of Sterquell's interest for $10,000 and indemnity of Sterquell from indebtedness of the partnership attributable to acquisition of the airport building.

Archer next called Harris, who had moved to Wichita Falls in May, 1993. Archer asked Harris to come to Amarillo. After Harris arrived in Amarillo on July 1st and talked to Archer, he went to Sterquell and told Sterquell that Archer wanted to work out a complete settlement of claims among the three of them, to include transfer of Harris's and Sterquell's partnership interests to Archer. On that same day, Harris, Sterquell, and Archer entered into negotiations for reciprocal releases of liability together with sale of Harris's and Sterquell's partnership interests. Agreement was eventually reached whereby Harris's interest in the partnership was assigned to Archer or nominee, the Sterquell interest in the partnership was transferred to Archer, and the parties released each other from all claims in connection with the partnership as well as in connection with other ventures. On July 1, 1994 the parties executed two agreements (collectively "the settlement agreements"): the Mutual Compromise, Settlement, and Partition Agreement prepared by Hazlewood (the "Settlement & Partition"), and an Agreement and Mutual Release (the "Mutual Release") prepared by an attorney representing Sterquell. Both documents recited the formation of and existence of the partnership. The Mutual Release drawn by Sterquell's attorney stated, in part:

> WHEREAS, Sterquell PST, Archer PST and Harris PST formed a partnership entitled Airport Building L.L.P. which purchased the [airport building]; and

> WHEREAS, Sterquell PST wishes to sell its interest in said Airport Building L.L.P., including, without limitation, any interest in the above-described real estate owned by L.L.P. to Archer PST;

> * * * *

> 1. In consideration of the sum of TEN THOUSAND AND NO/100 DOLLARS ($10,000) payable to it by Archer PST, Sterquell PST agrees to convey to Archer PST any and all interest which it holds in Airport Building, L.L.P. and the real estate owned by Airport Building, L.L.P....

The Settlement & Partition drawn by Archer's attorney Hazlewood stated, in part:

> Richard O. Harris, a partner in Airport Building, L.L.P., by the execution of this instrument, confirms his agreement in December, 1993, to sell and convey to "Archer" his partnership interest....

> A. Airport Building, L.L.P.

> The parties for the purpose of acquiring and managing that certain improved real estate ..., have created an entity named Airport Building, L.L.P., a partnership registered with the Texas Secretary of State. Various interests in the partnership are allocated to the parties signatory hereto.... The parties have negotiated for the sale and transfer of all interest of the Sterquell parties hereto to the Richard K. Archer Profit Sharing Trust, culminating in an agreement for such sale in December, 1993, for the sum of Ten Thousand Dollars and indemnity of all Sterquell indebtedness of the partnership attributable to the acquisition of the above referenced real estate of the partnership.[6]

---

6. Both Archer and Sterquell testified that the statement referencing December negotiations and agreement for Sterquell to sell his partnership interest was false. Sterquell testified

By the execution of this agreement, the sale is consummated and closed ... and all Sterquell interests in the partnership and in the partnership real estate are hereby set over, transferred, conveyed, assigned, and delivered to the Richard K. Archer Profit Sharing Plan Trust.

The Settlement & Partition included a reciprocal release of all claims, both known and unknown.

On July 5, 1994, the AEDC and the partnership, acting through Archer as partner, entered into an earnest money contract for sale of the airport building for $515,000. The sale closed on July 13th. The seller's closing statement showed a balance due to Airport Building, L.L.P., of $335,842.51 after payoff of the purchase money mortgage balance and closing costs. That amount was deposited to the bank account of Archer's PST on July 13th. On the same day, a check was drawn on the PST for $66,000 in favor of Richard K. Archer, M.D., P.A., and deposited in the bank account of the Archer P.A. On July 14th, the Archer PST wire transferred $269,000 to Reba Land, Inc. Reba was an Archer family investment vehicle.

When Sterquell and Harris learned of the sale of the building and that Archer had been negotiating the sale before July 1st, they each sought one-third of the profits. Archer declined to share, precipitating a lawsuit by Harris and Sterquell against Archer and Reba. Harris and Sterquell asserted via several theories that Archer breached his duty as a partner to disclose the AEDC offer to purchase the building before their July 1st negotiations and execution of the Mutual Release and Settlement and Partition agreements. They alleged that Archer's failure to disclose the AEDC negotiations caused damages to each of them in the amount of one-third of the net profits from the sale of the building less $10,000 paid by Archer to each of them for their partnership interests as part of the July 1st agreements.

Archer counterclaimed seeking to rescind or void the partnership agreement and to recover actual and punitive damages. He alleged that in 1992 Harris and Sterquell entered into a civil conspiracy to defraud him. Pursuant to that conspiracy, he alleged, Harris and Sterquell induced him to enter into a business transaction in December, 1992, for the purpose of acquiring the airport building. Parts of the scheme as alleged by Archer were: (1) a proposition by Harris and Sterquell that Archer, Sterquell, and Harris would enter into a partnership, as trustees for their respective profit sharing plans, which would purchase the airport building; (2) Archer agreed to provide financing for purchase of the real estate; (3) each of the three agreed to make an initial contribution to the partnership; (4) Sterquell promised to move administrative offices of American Housing Foundation ("AHF")[7] to the building as a tenant; and (5) Harris promised to provide management and leasing services. Archer claimed that neither Harris nor Sterquell intended to perform the promises they made. His claim as to Harris included an assertion that when Harris signed the partnership agreement as trustee for his PST, the PST did not

---

that he signed the agreement with the statement in it because the negotiations lasted long into the evening, he was tired, and Archer made threats to sue Sterquell over some of their other transactions if Sterquell did not settle.

7. American Housing Foundation was a nonprofit entity through which tax-advantaged real estate transactions were undertaken. Sterquell was its president.

exist.[8] Archer's claim as to Sterquell included assertions that had Archer known of Sterquell's bankruptcy before entering into the partnership, he would not have entered the partnership; Sterquell was Archer's CPA; Sterquell owed Archer a fiduciary duty to disclose the Chapter 11 bankruptcy before the partnership was formed; and failure to disclose the bankruptcy was fraud.

The trial court entered pretrial summary judgment denying Archer's counterclaims for damages based on fraudulent inducement to enter the partnership, without prejudice to Archer's asserting the claims defensively. Following the close of evidence at trial, Sterquell and Harris moved for an instructed verdict on Archer's defensive issues seeking rescission or voiding of the partnership agreement on the basis of fraudulent inducement. The motion asserted that no fact question existed as to Archer's claims being barred by his ratification of the partnership agreement. The motion was granted.

The jury found that (1) Archer, as Trustee, failed to comply with fiduciary duties to Sterquell and Harris, (2) Archer, individually, committed fraud against Sterquell and Harris, (3) Sterquell and Harris were each damaged in the amount of $101,947.50, (4) Sterquell and Harris complied with their fiduciary duties to Archer, (5) neither Sterquell nor Harris committed fraud against Archer after formation of the partnership but before AEDC expressed an interest in the airport building, (6) Harris agreed to sell his interest in the partnership and the airport building before AEDC expressed to Archer an interest in the airport building, (7) Sterquell did not agree to sell his interest in the partnership and the airport building before AEDC ex-

pressed to Archer an interest in the airport building, (8) Sterquell did not express in writing his consent for Harris to sell Harris's interest in the partnership or the airport building, (9) exemplary damages should be assessed in favor of Sterquell and against Archer in the amount of $750,000, (10) exemplary damages should be assessed in favor of Harris and against Archer in the amount of $750,000. Harris and Sterquell only sought recovery against Reba on a theory of constructive trust as to the $269,000 transferred to it by Archer following closing of the sale of the airport building to AEDC.

Sterquell and Harris moved the trial court to disregard the jury's answer to question 15, and for judgment on the remainder of the verdict. In answer to Question 15, the jury found that Harris agreed to sell the interest, if any, owned by him or his PST in the partnership and airport building property before the AEDC expressed an interest to Archer in purchasing the airport building property.

Archer and Reba moved the trial court to disregard all the jury's answers except the answer to question 15, and to render a take-nothing judgment.

The trial judge granted the motion of Archer and Reba as to Harris. The court based its ruling on (1) the jury's answer to question 15, and (2) Sterquell's January 7, 1994 letter which the court ruled constituted consent to Harris's December sale of his interest in the partnership to Branch Archer. Judgment was entered for the amounts found in favor of Sterquell, and a take-nothing judgment was entered as to Harris.

Harris urges in a single issue that the trial court erred in failing to enter judg-

8. Archer relied on documents establishing the Richard O. Harris Profit Sharing Trust which were not executed until November, 1993. The written PST documents recited an effective date of January 1, 1993, for the PST.

ment in his favor for the damages found by the jury.

Archer presents six issues in seeking to have the judgment in favor of Sterquell reversed. Issues one and two urge that Sterquell's breach of fiduciary duties as Archer's CPA and material misrepresentations constituted fraud which induced Archer to enter the partnership and warrant rescission of the partnership. Issue three asserts that material breach of the partnership agreement by Sterquell relieved Archer of any further fiduciary duty to Sterquell as a partner. Issue four claims that Sterquell's execution of the Settlement & Partition, with its recitations and release, and acceptance of the recited consideration, bar him from seeking recovery on the basis of fraud or breach of fiduciary duty by Archer. Issue five urges that Sterquell's actual damages should have been offset by all the consideration he received as a result of the July 1st settlement agreements, as well as by the proportionate responsibility of Harris. By issue six Archer argues that exemplary damages of 7.5 times the actual damages are factually and constitutionally excessive. Because of the nature of the issues presented, we first address Archer's appeal.

## II. ARCHER'S APPEAL [9]

### A. ISSUES ONE AND TWO: THE PARTIAL SUMMARY JUDGMENT AND DIRECTED VERDICT

Archer first urges that the trial court erred by granting an interlocutory partial summary judgment against Archer on his affirmative claims for damages based on allegations that Harris and Sterquell fraudulently induced him to enter the part-

nership. He also urges error in the trial court's granting an instructed verdict against him at trial on his defensive claims of fraudulent inducement, whereby he sought rescission of the partnership agreement. Because of the relationship between the summary judgment and the directed verdict, we consider them together.

As set out above, Archer's position is centered around allegations that he was fraudulently induced to enter the partnership via a conspiracy between Harris and Sterquell. The bases for his fraud claims were that (1) he would not have entered into the partnership if Sterquell had disclosed that he was personally in chapter 11 bankruptcy, which Sterquell had a fiduciary duty to do; (2) Sterquell promised to move the offices of American Housing Foundation (AHF) into the building as a tenant after the building was purchased, but Sterquell never intended to do so; (3) Harris promised to work on marketing and leasing the building, but he never intended to perform his promise, and (4) Sterquell and Harris never intended to make their initial capital contributions.

The interlocutory summary judgment against Archer on his counterclaims against Sterquell and Harris for fraudulently inducing him to enter the partnership and conspiring to fraudulently induce him to enter the partnership precluded Archer from offering proof of and submitting the theories and damage claims to the jury as affirmative claims. The trial court's summary judgment did not preclude Archer's attempt to prove the theories at trial, however. The summary judgment expressly provided that the judgment was without prejudice to the assertion of the claims defensively. On ap-

9. The issues, arguments and authorities presented by Archer and Reba are the same, to the extent the appeal presents issues by Reba. Our use of the term "Archer" as to the issues presented and arguments made shall encompass all issues and arguments of Reba unless otherwise noted.

peal, Archer does not urge that he was prevented from introducing evidence at trial on the claim that he was fraudulently induced to enter the partnership. To the contrary, he asserts on appeal that the summary judgment evidence and trial evidence of fraudulent inducement to enter the partnership is substantially the same, and his appellate brief on the issues refers us to his response to the motion for summary judgment. We first address the instructed verdict.

### 1. The Instructed Verdict

■ In response to Archer's attempt during pendency of the lawsuit to rescind the partnership agreement, Sterquell and Harris asserted that Archer ratified the agreement. Ratification is an affirmative defense. *See Montgomery v. Kennedy,* 669 S.W.2d 309, 310–11 (Tex.1984). An instructed verdict was proper only if ratification was conclusively proved. *See Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.,* 29 S.W.3d 74, 78 (Tex. 2000).

■ Generally, a contract may be either void and a nullity from its inception, or voidable. A contract which is voidable because it was the product of fraud is voided only if the defrauded party proves a right to avoid the contract and chooses to do so. *See Swain v. Wiley College,* 74 S.W.3d 143, 146 (Tex.App.-Texarkana 2002, no pet.). A void contract cannot be ratified; a voidable contract can be ratified. *Id.* A contract procured by fraud is merely voidable, unless it is shown to be void for some additional reason. *See id.* at 146–47; *GNG Gas Sys., Inc. v. Dean,* 921 S.W.2d 421, 427 (Tex.App.-Amarillo 1996, writ denied). If a party who has been induced by fraud to enter into a voidable agreement engages in conduct which recognizes the agreement as subsisting and binding after the party has become aware

of the fraud, the party thereby ratifies the agreement and waives any right to assert the fraud as basis to avoid the agreement. *See Rosenbaum v. Texas Bldg. & Mortg. Co.,* 167 S.W.2d 506, 508, 140 Tex. 325 (1943). An express ratification is not necessary; any act based upon a recognition of the agreement as subsisting or conduct inconsistent with an intention to avoid it has the effect of waiving the right of rescission. *Id.* The relevant inquiry as to ratification is what actions were taken by the party seeking to avoid the contract once that party became fully aware of the alleged fraud. *See Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d 754, 756–57 (Tex.1980). Once a party ratifies an agreement, that party may not later withdraw the ratification and seek to avoid the contract. *See Missouri Pac. R. Co. v. Lely Dev. Corp.,* 86 S.W.3d 787, 792 (Tex.App.-Austin 2002, pet. dism'd).

■ In reviewing the propriety of the instructed verdict, we view the evidence in the light most favorable to, and indulge all reasonable inferences in favor of, non-movant Archer. *See Prudential Ins. Co.,* 29 S.W.3d at 82.

Archer's pleadings and testimony established that no later than the end of December, 1993, he knew (1) Sterquell was not going to perform what Archer alleged was a promise to move AHF into the building, (2) Harris had moved to Wichita Falls in May, 1993, and had, according to Archer, made no efforts to market the building, (3) Harris had agreed to sell his partnership interest to Branch, although Sterquell was taking the position that Sterquell did not agree to Harris's selling. Richard was responsible for keeping the partnership books and filing its tax returns. He used his PST bank account as the partnership account. Archer testified at trial that (1) he learned of Sterquell's bankruptcy from Branch Archer in the Spring of 1994; (2)

he considered his PST to be a one-third partner in the partnership at all times from the Spring of 1993 until execution of the agreements of July 1, 1994; and (3) he took no action to rescind the partnership before the July 1st agreements were made.

██ Thus, before July 1st, Richard was aware of the alleged fraud on which he based his attempt in the lawsuit to rescind the partnership agreement. Despite such knowledge, Richard testified at trial (1) he always considered himself, or his PST, to have been a one-third partner in the partnership; (2) he remained in the partnership voluntarily and of his own free will until July 1, 1994; (3) as of July 1st, he considered that his brother Branch effectively became owner of two-thirds interest in the partnership via the settlement agreements and transfers of the interests of Sterquell and Harris.

Archer's pleadings consistently asserted the validity of the two July 1, 1994, agreements. He asserted the validity of the agreements in affidavits, deposition and trial testimony. The agreements' validity was pled and asserted via both affirmative claims for damages and defensive theories such as estoppel, waiver, accord and satisfaction, and release from liability. At the same time, Archer asserted in the lawsuit that he was induced to enter into the partnership agreement by Sterquell's breach of fiduciary duties as outlined above, which comprised fraud, and promises made by Sterquell and Harris which they never intended to fulfill. Archer nevertheless maintained that his interest in the proceeds of the sale of the airport building was one-third and the interest of Branch's estate, of which Richard was executor, was two-thirds. He relied on the July 1, 1994, transactions and settlement agreements in taking such position.

Assuming, *arguendo*, that the actions of Sterquell and Harris complained of by Archer in fact took place and were fraud, Archer took actions recognizing the partnership agreement after he learned of those actions. *See F.M. Stigler, Inc.*, 609 S.W.2d at 756–57; *Rosenbaum*, 167 S.W.2d at 508. Once he ratified the partnership agreement, Archer could not later rescind it. As the trial court stated in granting the motion for directed verdict during trial, "Dr. Archer, even today, however, is treating his portion as one-third, and that can be nothing but ratification." The evidence and pleadings conclusively established ratification of the partnership by Archer. The directed verdict was proper.

### 2. The Summary Judgment

██ A party may ratify an agreement induced by fraud in such a way that both the right to rescind and a claim for damages are foreclosed, although ratification can also be in such a way that loss of the right to rescind the contract occurs without loss of the right to sue for damages. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 677–78 (Tex.2000). So, even though Archer's actions ratifying the partnership agreement barred his attempt to rescind the agreement, those actions did not necessarily bar the affirmative claim for damages which was the subject of the partial summary judgment.

The motion for summary judgment was based on several theories. The order granting summary judgment did not specify the basis on which the motion was granted. In such a situation, the judgment will be affirmed on any meritorious ground expressly presented in the motion and which is preserved for appellate review. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380–81 (Tex.1993).

A party may prevail on a summary judgment motion by conclusively establishing the absence of any genuine issue of a material fact and that the party is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). We review the granting of summary judgment using the standards set out in *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985):

—The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

—In determining whether there is a disputed issue of material fact precluding summary judgment, evidence favorable to the non-movant will be taken as true.

—Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

Because Sterquell and Harris were moving for summary judgment as to Archer's affirmative claim for damages, in order to be entitled to summary judgment they were required to disprove at least one of the elements of Archer's cause of action, or, alternatively, to prove each element of an affirmative defense such as ratification. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995).

By part of the very broad release language of the July 1, 1994, Settlement and Partition, Archer released Sterquell and Harris from all claims and damages which in any way, directly or indirectly, arose out of transactions described in the Settlement and Partition. The agreement referenced the partnership, its formation, its operation, and the sale and transfer of the interests of Harris and Sterquell to Archer. Archer did not assert in response to the motion for summary judgment of Sterquell and Harris that the Settlement and Partition did not release his claims for damages against them. *See* Tex.R. Civ. P. 166a(c); *Casso v. Brand*, 776 S.W.2d 551, 553 (Tex. 1989). To the contrary, at the time the summary judgment was heard, Archer's pleadings and response to the summary judgment motion urged the validity of the Settlement and Partition.

The summary judgment evidence conclusively proved Archer's ratification of the partnership and that the ratification extended to his claim for damages. The trial court did not err in granting summary judgment. *See Fortune Prod. Co.*, 52 S.W.3d at 677.

Moreover, if the directed verdict was proper and the summary judgment was improper, the summary judgment did not result in entry of an improper judgment, *see* Tex.R.App. P. 44.1(a) [10], because Archer had a full opportunity at trial to present his theory that Sterquell and Harris fraudulently induced him to enter the partnership. The Settlement and Partition and Mutual Release agreements were introduced into evidence. Whether Archer's claims for rescission of the partnership agreement or for damages based on allegations that he was fraudulently induced to enter the partnership were removed from the case by the interlocutory pretrial summary judgment or the directed verdict, the result is the same under this record: he was permitted to introduce evidence on the theories, but was denied submission of the issue to the jury. *See McCall v. Tana Oil and Gas Corp.*, 82 S.W.3d 337, 343 (Tex. App.-Austin 2001), *rev'd on other grounds*, 104 S.W.3d 80 (Tex.2003).

In sum, as a matter of law, Archer ratified the partnership agreement in such manner that he was foreclosed from seeking both rescission and damages. We

10. Further references to a rule of appellate procedure will be as "TRAP_".

need not consider any other grounds presented by Sterquell and Harris in their motion for summary judgment other than ratification.

The trial court did not err either by granting partial summary judgment or directing a verdict against Archer. We overrule Archer's first and second issues.

## B. ISSUE THREE: MATERIAL BREACH OF PARTNERSHIP AGREEMENT BY STERQUELL AND HARRIS

Archer's third issue complains that the trial court erred in granting the motion for directed verdict of Sterquell and Harris as to Archer's allegations that he owed them no fiduciary duties because they materially breached the partnership agreement when they failed to make their initial capital contributions and failed to devote proper time and attention to partnership affairs. He argues that the evidence raises a fact issue as to the matters. Archer generally references 23 pages of the record as support for his issue.

Sterquell and Harris respond, in part, that their motion for directed verdict did not address Archer's claim that they had materially breached the partnership agreement, but that the motion only addressed Archer's defensive claim of fraudulent inducement to enter the partnership.

We agree with Sterquell and Harris. The trial court did not grant a directed verdict as to the matters alleged by Archer. We overrule issue three.

## C. ISSUE FOUR: DO THE JULY 1, 1994, SETTLEMENT AGREEMENTS BAR THE CLAIMS OF STERQUELL

Archer's fourth issue urges that the Settlement and Partition agreement precludes Sterquell's recovery. His only complaint in this issue as to the jury charge is that the trial court refused to submit an instruction on estoppel in connection with a jury question inquiring whether Sterquell agreed to sell his interest in the partnership before the AEDC expressed an interest to Archer in purchasing the airport building property. Otherwise, Archer does not complain that the trial court failed to submit a jury question or instruction, and he points to no jury question in his favor in the issue. Accordingly, except for the failure of the trial court to submit the estoppel instruction, we construe the issue as urging that Sterquell is barred from recovery as a matter of law.

The issue presents four subparts, although only two of the subparts fall into the subject matter urged by Archer's statement of the issue. By the first subpart, Archer asserts that Sterquell is barred from claiming that a breach of fiduciary duty by Archer induced Sterquell to enter into a settlement of the partnership affairs because the settlement agreements (1) recited a prior agreement to sell Sterquell's partnership interest, (2) resulted in consideration paid to Sterquell for his partnership interest as well as for release of other claims, and (3) released Archer from all claims and causes of action. The second subpart urges that Sterquell ratified the agreements and is estopped from asserting the releases are invalid because he has retained the $10,000 Archer paid pursuant to the releases. In the third subpart Archer claims that Sterquell's January 4, 1994, letter was a dissolution of the partnership. The fourth subpart presents the claim that Sterquell's January 7, 1994, letter granted an option to Archer to purchase Sterquell's interest.

■ As to the first subpart, neither the mere recitation in the July 1st Settlement and Partition of a prior agreement by Sterquell to sell his partnership interest

nor the payment of consideration to Sterquell upon execution of the Settlement and Partition terminated the partnership on some date before execution of the Settlement and Partition. *See Rodgers v. RAB Invs., Ltd.*, 816 S.W.2d 543, 547 (Tex.App.-Dallas 1991, no writ). So long as the partnership existed, Archer had a fiduciary duty to disclose the June negotiations to Sterquell. *See M.R. Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex.1995).

Archer's reliance on *Steubner Realty 19 v. Cravens Rd. 88*, 817 S.W.2d 160 (Tex. App.-Houston [14th Dist.] 1991, no writ), is misplaced. In *Steubner Realty 19*, the purchaser of realty claimed damages because of an easement which prevented development of the property. The evidence, however, showed that the purchaser had originally negotiated for a price reduction because of the easement's existence. Under such circumstances the purchaser was estopped from taking a post-sale position inconsistent with pre-sale actions demonstrating the purchaser knew of the easement. *Id.* 162–64. Archer, however, does not claim that Sterquell had knowledge of Archer's negotiations to sell the airport building at a profit when the July 1st agreements were negotiated.

Archer likewise misplaces his confidence in *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171 (Tex.1997), in asserting that Sterquell released his claims for breach of fiduciary duty by the settlement agreement language. In *Schlumberger* the Supreme Court affirmed two principles: (1) merger clauses in releases can be avoided based on fraud in the inducement; but (2) parties to a settlement agreement may validly disclaim reliance on representations which might otherwise warrant a claim of fraud in the inducement. *Id.* at 179. The Court also noted that the issue when merger clauses are present in settlement agreements is whether the disclaimer of reliance is binding under the particular facts presented. *Id.* In *Schlumberger*, the disclaimer was held to be binding. The facts presented in *Schlumberger*, however, included arms-length negotiations, discussions involving the very subject matter which the Swansons claimed was misrepresented to them, and the existence in the agreement of language specifically disclaiming reliance on statements or representations of other parties. Moreover, the Court clearly stated that even a disclaimer of reliance on prior statements and representations, or a merger clause, will not always bar fraudulent inducement claims, and that there was no evidence of a fiduciary or confidential relationship between the parties. *Id.* at 181.

Unlike *Schlumberger*, the record before us manifests a fiduciary relationship. There is no evidence that the parties intended to settle their disputes and partnership affairs with both sides having knowledge of or there having been negotiations about the imminent sale of the partnership property for a profit of over $300,000. Nor is there language in either of the agreements specifically disclaiming reliance on statements, representations, or non-disclosures of material information by the other parties. The record does not support Archer's position that, as a matter of law, the agreement was intended to release claims for breach of a fiduciary duty to disclose material information.

By the second subpart of issue four Archer urges that Sterquell ratified the July 1st settlement agreements and is estopped from asserting the releases are invalid. When Sterquell discovered Archer's sale of the airport building soon after execution of the July 1st agreements, he took action indicating his disapproval of the events. Sterquell promptly protested Archer's failure to timely disclose the June, 1994 negotiations to sell the airport

property; demanded a share of the profits; and then filed suit. Sterquell's protest, demand and filing suit were not inconsistent with prior positions he had taken.[11] Sterquell chose a remedy available to him: retain the consideration paid by Archer, stand on the agreements and seek damages caused by his execution of them. *See Dallas Farm Machinery Co. v. Reaves*, 158 Tex. 1, 307 S.W.2d 233, 238–39 (1957); *Amarillo Transfer & Storage Co. v. De Shong*, 82 S.W.2d 381, 385–86 (Tex.Civ. App.-Amarillo 1935, no writ). The evidence did not establish that Sterquell, as a matter of law, ratified the agreements as releasing Archer for his breach of fiduciary duty to disclose the AEDC offer, or was estopped from asserting that Archer fraudulently induced Sterquell to enter into the agreements and that Sterquell was thereby damaged.

As part of the second subpart of the fourth issue, we address Archer's complaint as to the jury charge. Archer submitted a proposed jury question inquiring whether Sterquell agreed to sell his interest in the partnership before the AEDC expressed interest in the property to Archer. The proposed question included two instructions, one of which Archer alleges would have allowed the jury to determine whether Sterquell was estopped from denying an agreement in December, 1993, to sell his partnership interest. The trial court refused to submit the question as proposed by Archer, but submitted substantially the same question without the proposed estoppel instruction, as jury question 16. Archer objected to the trial court's failure to submit the estoppel instruction he included within his proposed jury question and obtained a ruling, al-though he did not submit a separate written proposed instruction on estoppel. Sterquell responds, in part, that Archer did not preserve error because a proposed instruction was not submitted separately as required by Tex.R. Civ. P. 278, and that the instruction Archer submitted was incorrect as well as confusing.

We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *See In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). We agree with Archer that under the record presented, he adequately and timely brought his complaint and instruction to the trial court's attention, obtained a ruling, and thereby preserved error. *See Alaniz v. Jones & Neuse, Inc.*, 907 S.W.2d 450, 451 (Tex.1995).

The jury question inquired whether Sterquell agreed to sell the interest he or his profit sharing trust claimed in the airport building partnership and property before the AEDC expressed an interest to Archer in purchasing the airport building. The instruction Archer requested was, in part, that Sterquell could not deny he agreed to sell *his* interest if the denial was inconsistent with a position *they* had previously taken and Archer did not know that Harris would deny that *they* agreed to sell *their* interest. The instruction did not clarify whether "his" interest included the interest of Sterquell's profit sharing trust, and did not explain who was referred to by the words "they" and "their." Reading the instruction in conjunction with the jury question to which it related, the instruction could have been construed by the trial court as confusing and unclear. The trial

---

11. Sterquell's actions are in contrast to those of Archer. Archer ratified the partnership by failing to take action to protest the circumstances or rescind the partnership after he had knowledge of the actions he relied on in his rescission claim: Sterquell's failure to move AHF offices into the airport property, Sterquell's bankruptcy, and Sterquell's alleged failure to contribute the initial capital.

court's refusal to give the instruction was not an abuse of discretion and was not arbitrary or unreasonable. *See Goode v. Shoukfeh,* 943 S.W.2d 441, 446 (Tex.1997). The refusal to give the instruction was not error.

In the third subpart of issue four, Archer claims that Sterquell's January 4, 1994, letter was a dissolution of the partnership, and that following dissolution of the partnership, Archer did not owe a duty to his former partner to disclose a business opportunity which arose after dissolution. He does not argue that the trial court refused to submit a jury question inquiring as to dissolution, such as whether Sterquell intended to dissolve the partnership by the letter. Thus, we are faced with Archer urging, at bottom, that the language of Sterquell's letter, as a matter of law, dissolved the partnership.

Archer refers us to *Thomas v. American Nat'l Bank,* 704 S.W.2d 321, 323–24 (Tex.1986), for the proposition that Sterquell dissolved the partnership when he expressed a desire to sell his partnership interest in the January, 1994, letter. In *Thomas,* the partnership consisted of three partners. Thomas, one of the three partners, testified that he told the managing partner of PGR Investments Company, a second partner, that Thomas and the third partner wanted to end the partnership. The trial court granted summary judgment that the partnership had not been dissolved by Thomas' actions. *Id.* at 322. The Texas Supreme Court reversed the summary judgment. In doing so, the Court noted that a partnership may be dissolved by the express will of a partner, and held that Thomas' testimony was some evidence that he expressly intended to and did dissolve the partnership by making the statement he testified to. *Id.* at 323–24.

■ We do not read Sterquell's letter of January 7, 1994, to set out his express will that the partnership be dissolved. To the contrary, the letter contemplates continuation of the partnership. In it Sterquell makes offers, in the alternative, for Sterquell to purchase interests of Harris and Archer or to allow Archer to purchase interests of Sterquell and Harris. Via the July 1st agreements the interests of Sterquell and Harris were in fact sold, after which the partnership sold the airport building through Archer, one of its continuing partners. The letter did not, as a matter of law, dissolve the partnership.

The fourth subpart of issue four presents the claim that Sterquell's January 7, 1994, letter granted an option to Archer to purchase Sterquell's interest. In that letter, Sterquell confirmed an agreement with Archer and Harris that Sterquell could purchase both of their interests if he did so by the end of January; and that if he did not do so, then Archer would have the "same option" to purchase the interests of Sterquell and Harris. In presenting his argument, Archer argues that when the optionee elects to purchase property pursuant to an option, then a contract for sale arises. He continues by reasoning, without citation to any authority, that the existence of the option to purchase removed any fiduciary duty Archer would have had to disclose the discovery of a buyer for the partnership property.

■ We disagree. Assuming, arguendo, the bare existence of a valid option to purchase the interest of Sterquell would have terminated Archer's fiduciary duty to Sterquell, the existence of such an option until July 1st was disputed. Sterquell's position, supported by evidence, was that Archer's option was for only 30 days following the end of January, 1994. Archer does not present a jury finding on the duration of the option, which Archer apparently views as having extended indefinitely. Nor does Archer claim to have

exercised the option at any time prior to the July 1st negotiations and agreements. Given this state of the record, Archer's partnership relationship with, and his attendant fiduciary duty to, Sterquell existed until the relationship was terminated by the July 1st agreements. *See M.R. Champion, Inc.* 904 S.W.2d at 618. Liability for breach of such duty existed so long as the duty existed. *Id.* Issue four is overruled.

### D. ISSUE FIVE: REDUCTION OF ACTUAL DAMAGES BY OFFSET OR PROPORTIONATE RESPONSIBILITY

Archer next urges that the actual damages awarded to Sterquell should be reduced by (1) recoupment or setoff in the total amount of consideration Sterquell received from Archer as a result of the July 1st settlement agreements, and (2) the proportionate responsibility of Harris. The issue is presented in two parts and we will address it in that manner.

#### 1. Recoupment or Setoff

First, Archer challenges the jury's finding to jury question 18. Question 18 was conditioned on the jury having previously found that Sterquell suffered actual damages, and asked the jury to find what sum of money, if any, should be subtracted from the actual damages as recoupment or setoff. The jury was instructed to consider only money paid to Sterquell as consideration for the two July 1st agreements, other than "the $10,000." The question placed the burden of proof on Archer. The jury answered "0.00."

Archer's issue initially asserts that, as a matter of law, Sterquell's damages should be offset by $45,000 which Sterquell re-

ceived as consideration for the releases set out in the July 1st agreements. His argument, however, urges that the evidence is factually insufficient to support the jury's answer and is against the overwhelming weight of the evidence. Archer posits that Sterquell disclaims his obligations under the agreements, and thus is not entitled to retain the $45,000 as a benefit of the agreements.

■ Archer does not favor us with authority addressing (1) the doctrines or elements of setoff or recoupment,[12] (2) the burden of proof, or (3) the standards of review.[13] Nor does he reference the record except for references to jury question 18 and a copy of the $55,000 check from Archer to Sterquell. We consider the issue insufficiently briefed. *See* TRAP 38.1(h).

■ Moreover, Archer mischaracterizes Sterquell's position. As we have previously noted, Sterquell did not disclaim or seek to set aside the agreements or avoid the releases in the agreements; he claimed damages because of the agreements' existence. Both agreements of July 1st referenced Palo Duro, L.L.P., as one of the entities other than the airport building partnership in connection with which Sterquell and Archer had been involved on a business basis. The agreements addressed claims which Sterquell asserted for services rendered to or for the benefit of Palo Duro, and which were compromised and settled as part of the agreements. The amount of $45,000 specifically referenced Sterquell's claims in regard to Palo Duro. The agreements also specifically set out the amount of $10,000 as payment for Sterquell's interest in the Airport

---

12. *See Sommers v. Concepcion,* 20 S.W.3d 27, 34–35 (Tex.App.-Houston (14th Dist.) 2000, pet. denied).

13. *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241–42 (Tex.2001); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989).

Building partnership. Unobjected-to testimony by Sterquell during trial confirmed that $45,000 was for services he claimed to have rendered for the benefit of Palo Duro, independent of the Airport Building partnership.

Question 18 was conditioned on the jury having previously found actual damages to Sterquell in response to jury question 6. Jury question 6 instructed the jury to consider as elements of damages only the share of the sales proceeds of the airport building to which each partner would have been entitled, less amounts required to pay off the note, other closing costs of the sale, and the $10,000 already paid to each partner by Archer for their airport building partnership interest. The settlement agreements and Sterquell's testimony are legally and factually sufficient evidence to support the jury's answer to question 18. *See Sterner*, 767 S.W.2d at 690; *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex.1988).

## 2. Proportionate Responsibility of Harris

The trial court refused to submit Archer's proposed question asking the jury to find the percentage of Sterquell's actual damages which were caused by Archer and the percentage caused by Harris. Archer relies on Tex. Civ. Pract. & Rem.Code Ann. § 33.003 (Vernon 1997),[14] but does not cite any case authority in support of his position.

In advancing his theory, Archer refers to evidence that Harris encouraged Archer to end the relationship with Sterquell as early as November, 1993; wrote a note in December, 1993, indicating that if Sterquell did not agree to sell his partnership interest, Harris "would get it done"; and acted as a go-between as to Archer and Sterquell because Archer and Sterquell

were not talking with each other during the months before July 1, 1994. Archer does not claim that before execution of the July 1st agreements Harris had knowledge of Archer's June, 1994, negotiations with the AEDC.

Sterquell and Harris filed suit in July, 1994. As Sterquell points out, section 33.002 specifically excluded claims based on intentional torts from chapter 33's comparative responsibility provisions until the Civil Practice and Remedies Code was amended in 1995. *See* Act of May 18, 1995, 74th Leg., R.S. ch. 136 § 1, 1995 Tex. Gen. Laws 971. The law in effect prior to September 1,1995, was continued in effect and applied to causes of action which accrued before September 1, 1995, and on which suit was filed before September 1, 1996. *Id.* § 3 at 976.

 Sterquell claimed that Archer intentionally withheld information about the AEDC negotiations. Section 33.003 did not apply to Sterquell's claim. The trial court did not err in refusing to submit Archer's proposed question to the jury.

## E. ISSUE SIX: EXEMPLARY DAMAGES

Archer's sixth issue challenges the award of exemplary damages. His challenge is presented in two parts. First, Archer challenges the factual sufficiency of the evidence to support the amount of exemplary damages. Second, he asserts that the exemplary damages are unconstitutionally excessive because they exceed four times actual damages.

Archer relies on, in part, *Apache Corp. v. Moore*, 960 S.W.2d 746 (Tex.App.-Amarillo 1997, pet. denied), and its reference to

14. Further reference to a provision of the Texas Civil Practice and Remedies Code shall be by reference to "TCPRC § _____."

**436**

*BMW of North America, Inc., v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). He does not assert that the jury findings of breach of fiduciary duty (question 1) with the intent to gain an additional benefit for himself or his PST (question 3) and fraud (question 4) are insufficient to support exemplary damages. *See Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 23 n. 16 (Tex.1994) (only if a tort is accompanied by gross negligence, intentional injury, fraud or malice are punitive damages proper).

Sterquell responds that Archer's actions constituted an intentional tort and that the Legislature excluded such torts from the limitation on exemplary damages in the law effective at the time of Archer's actions. *See* Act of June 16, 1987, 70th Leg., 1st C.S. ch. 2 § 2.12, 1987 Tex. Gen. Laws 44–5. Sterquell argues further that, as evidenced by subsequent amendments to chapter 41 of the Texas Civil Practice and Remedies Code, the Legislature has regarded and does regard actions such as Archer's to be so egregious that those actions have been exempted from limitations on exemplary damages. He references TCPRC § 41.008(c)(10) (misapplication of fiduciary property). He argues that the jury's exemplary damages award of $750,000 was less than 7.5 times the actual damages of $101,947.50, is not limited by statute, is not constitutionally excessive, and is supported by abundant evidence. We *will begin by reviewing* whether the exemplary damages are unconstitutional because they exceed four times actual damages.

▮▮▮▮ The assessment of the extent of a plaintiff's injury and the measure of what amount of actual damages is reasonably necessary to compensate for the injury is essentially a factual determination. *See Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 432, 121 S.Ct. 1678, 1683, 149 L.Ed.2d 674 (2001). The awarding of exemplary or punitive damages is not such a measurement, however. The awarding of exemplary damages is a reflection of moral condemnation of the conduct in question which is designed to punish the perpetrator and deter such conduct in the future. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003); TCPRC § 41.001. As such, the decision of whether to assess exemplary damages and if so, the amount to assess is not, at bottom, a "question of fact" as that term is generally used in appellate review. *See Cooper,* 532 U.S. at 437, 121 S.Ct. 1678. Rather, the decision is a matter entrusted to the discretion of the jury, within certain boundaries, just as the assessment of criminal penalties is entrusted to the discretion of the jury within confines of the penalties legislatively prescribed for the particular crime. *See id.* at 432–34, 121 S.Ct. 1678. *See also* TCPRC section 41.010(b) (determination of amount of exemplary damages to be awarded is within discretion of the trier of fact). The amount of exemplary damages is not considered excessive, that is, to have resulted from impermissible motives such as passion or prejudice, or to have been assessed in disregard of the evidence, so long as the amount of exemplary damages is reasonably proportioned to actual damages, *see Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981), and proportional to the gravity of the offense; that is, not excessive under the facts presented. *See Cooper,* 532 U.S. at 434–35, 121 S.Ct. 1678, (Due Process Clause of the Fourteenth Amendment to the Federal Constitution is violated when exemplary damages are grossly disproportional to gravity of defendant's offense); *Gore,* 517 U.S. at 568, 116 S.Ct. 1589. Because of the wide discretion allowed to the jury in assessing exemplary damages and the potential for arbitrary

deprivation of property by assessment of such damages, appellate courts are to review the Fourteenth Amendment's Due Process excessiveness question *de novo*. *See Campbell*, 123 S.Ct. at 1519–20; *Cooper*, 532 U.S. at 435–36, 121 S.Ct. 1678; *Gore*, 517 U.S. at 586, 116 S.Ct. 1589. In referencing *de novo* review, however, the Supreme Court noted that appellate review should be with deference to findings of fact made at the trial court level, unless such findings are clearly erroneous. *See Cooper*, 532 U.S. at 440 n. 14, 121 S.Ct. 1678. Such a standard of review is comparable to the standard by which Texas appellate courts review factual findings for legal and factual sufficiency, and review legal conclusions *de novo, see BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002), as opposed to true *de novo* appellate review whereby the appellate court exercises its own judgment and redetermines each issue of fact and law giving no deference to the trial court's decisions. *See Quick v. City of Austin*, 7 S.W.3d 109, 116 (Tex.1998).

■ In the matter pending before us, the trial court examined the amount of exemplary damages for excessiveness according to the criteria identified in *Apache* and *Gore*. The trial court found that the exemplary damages were not excessive. We review the federal due process excessiveness question by giving deference to the jury's findings and the trial court's determination that the exemplary damages were not excessive. *See Cooper*, 532 U.S. at 440 n. 14, 121 S.Ct. at 1688 n. 14; *BMC Software*, 83 S.W.3d at 794.

■ In *Gore*, the United States Supreme Court set out three "guideposts" for evaluating whether an exemplary damages award is excessive when considering federal due process requirements: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio between harm or potential harm to the plaintiff and the amount awarded (measure of punishment must be both reasonable and proportionate to the amount of harm to plaintiff and to the actual damages recovered), and (3) the disparity between the exemplary damages assessed and civil penalties authorized or imposed in comparable cases. *See Campbell*, 123 S.Ct. at 1520–21, 1524, 1526; *Gore*, 517 U.S. at 574–85, 116 S.Ct. 1589.[15]

■ The most important guidepost in reviewing the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. *Campbell*, 123 S.Ct. at 1521. In determining reprehensibility, we consider whether (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced a reckless disregard of the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, deceit, or mere accident. *Id.*

Although some friction existed among Archer, Harris, and Sterquell during latter 1993 and the first months of 1994, Archer was accused only of tortious conduct in connection with his concealing of the AEDC offer from Sterquell and Harris prior to and during negotiations leading to the July 1, 1994, agreements.

---

**15.** The *Kraus* factors are considerations encompassed within the *Gore* guideposts. *See Apache*, 960 S.W.2d at 749. The *Kraus* factors are (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Kraus*, 616 S.W.2d at 910. *See also Moriel*, 879 S.W.2d at 31.

Archer, Harris, and Sterquell were all reasonably sophisticated businessmen. All had been involved in transactions involving tax shelters, real estate transactions and investments of other kinds. Harris was a retired banker and had been a bank president. Sterquell was a certified public accountant who originated and participated in what some would consider complex tax-advantaged transactions in addition to his accounting practice. Archer was an active investor and member of a family which had broad-ranging investments to the extent that Reba Land was incorporated as a vehicle to hold some of the family investments. The partners in the airport building partnership were profit sharing trusts, not the men themselves. All three men had in the past been represented by and were represented by attorneys in their business dealings during the existence of the partnership and during the July 1st negotiations which led to execution of the settlement agreements.

■ Considering factors one, four and five of the first *Gore* guidepost, we see that the harm to Sterquell was economic, Archer's tort was an isolated instance, but it was an intentional action intended to gain a benefit for himself in violation of his fiduciary duty. As to factor three, Sterquell was not in a position of financial vulnerability. His bankruptcy had been dismissed before July 1, 1994. In any event, Sterquell's PST, which was the actual partner in the partnership, was an exempt asset in the bankruptcy. Factor two is inapplicable to this matter: Archer's conduct did not involve the physical health or safety of others. The facts before us, measured by the factors under the first and most important *Gore* guidepost, lead us to conclude that Archer's conduct in withholding information was reprehensible, yet without indicia which elevates its classification to what the United States Supreme

Court has referred to as "particularly egregious."

■ The second guidepost in determining whether exemplary damages are Constitutionally excessive involves the ratio between harm or potential harm to the plaintiff and the amount awarded. *Campbell*, 123 S.Ct. at 1524. There is no bright-line Constitutional ratio to define awards which are excessive. Citing legislative history of ratios of double, triple and quadruple actual damages as instructive, the Supreme Court recently referenced language in its prior opinions that ratios of more than four times compensatory damages might be close to the line of Constitutional propriety. *Id.*, citing *Gore* and *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Particularly egregious actions resulting in injuries which are hard to detect or damages which are difficult to determine might warrant higher ratios, while in cases involving substantial compensatory damages, then a lesser ratio, "perhaps only equal to compensatory damages," can reach the outermost limit of the due process guarantee. *Campbell*, 123 S.Ct. at 1524.

In considering this second guidepost, we consider that actual damages of $101,947.50 are not insubstantial. Potential damages to Sterquell are not a factor to be considered as there were no further damages which could have occurred. It was not difficult for Sterquell to determine that he had suffered damages and the amount of the damages. Calculating one-third of the net profit from the sale of the airport building was a fairly simple matter of reviewing closing statements from the sale of the building.

■ The factors of the second *Gore* guidepost indicate that a Constitutionally-permissible award of exemplary damages under these facts would be in the category

of a "lesser ratio" as referenced by the United States Supreme Court. *See id.*

■ The third *Gore* guidepost requires consideration of the exemplary damages award and civil penalties authorized or imposed in comparable cases. Our review is guided to a large extent by our consideration in *Apache* of an exemplary damages award which was not limited by applicable statutory law. On original submission in *Apache*, we affirmed awards with ratios of exemplary damages to actual economic damages of 185:1 and 92:1. The United States Supreme Court remanded the case for reconsideration in light of its decision in *Gore.* Upon remand, we looked, in part, for guidance in acts of the Legislature, even though those acts were not applicable to the claims in *Apache.* We noted the Legislature's limitation of exemplary damages to the greater of four times actual damages, or $200,000, as to some actions. *Apache,* 960 S.W.2d at 749–50. We also noted the Legislature's subsequent limitation of exemplary damages in certain actions to an amount equal to the greater of (1) two times the amount of economic damages plus an amount equal to noneconomic damages not to exceed $750,000, or (2) $200,000. *Id. See* TCPRC § 41.008(b) (Vernon Supp.2004). We held that under the *Gore* guideposts and the particular facts of *Apache*, an award of exemplary damages exceeding four times economic damages was constitutionally excessive. *Apache,* 960 S.W.2d at 750.

Sterquell argues that Archer's action in selling the airport building after Sterquell and Harris sold their partnership interests via the July 1st agreements was, in effect, a misapplication of fiduciary property. He references TCPRC § 41.008(c)(10) which provides that the limitations on exemplary damages of chapter 41 do not apply if a cause of action is based on a defendant's actions described as a felony by TEX. PEN. CODE ANN. § 32.45 (Vernon Supp.2004) (misapplication of fiduciary property).

■ In making his argument that Archer misapplied fiduciary property, Sterquell does not disclose the basis on which he claims a fiduciary relationship continued to exist between Archer and Sterquell after Sterquell sold his partnership interest to Archer via the July 1st agreements. Sterquell and Harris did not seek rescission of the agreements. Sterquell does not contend that he somehow remained a partner with or had any other relationship to Archer after executing the agreements and transferring his partnership interest to Archer. Nor does Sterquell present jury findings that at the time the airport building was sold to the AEDC, Archer was holding the building as a "fiduciary" in regard to Sterquell, and that Archer "misapplied" property by dealing with it contrary to (1) an agreement with Sterquell under which Archer held the property, or (2) a law prescribing the custody or disposition of the property. *See* Penal Code §§ 32.45(a)(1),(2),(b). Sterquell's argument does not persuade us that the Legislature has exempted conduct such as Archer's from the provisions of chapter 41 as it has been amended,[16] and that we should not look to *Apache* for guidance.

■ The economic injuries caused by the defendants in *Apache* were not deemed to have been intentionally inflicted. *Apache,* 960 S.W.2d at 749. The jury in this matter found that Archer's actions were intended to benefit himself to the detriment of his partners. On the other

---

**16.** Thus, we express no opinion on what effect, if any, the Texas Legislature's exemption of certain conduct from the limitations of TCPRC Chapter 41 would have in regard to a Federal Due Process excessiveness issue.

hand, the plaintiffs' economic damages in *Apache* were $2,706 and $5,425, much more modest sums than the $101,947.50 economic damages to Sterquell. As we did in *Apache*, we note and give consideration to the Legislature's view of appropriate ratios of exemplary damages for causes of action such as the one before us as expressed in statutory enactments, although the enactments apply only to causes of action arising later in time to the cause before us. Doing so, we agree with Archer that under the facts of this case, the exemplary damages award in excess of four times Sterquell's actual economic damages exceeds the ratio permitted by the Due Process Clause of the Fourteenth Amendment. *See Campbell,* 123 S.Ct. at 1524; *Apache,* 960 S.W.2d at 750.

We sustain Archer's sixth issue to the extent it challenges the Constitutional excessiveness of the exemplary damages award. Because we sustain Archer's issue on the basis of the Federal Constitution's Due Process Clause, we do not consider his arguments as to the Texas Constitution. *See* TRAP 47.1.

We next address Archer's contention that the evidence is factually insufficient to support the exemplary damages award. Because we have determined that exemplary damages in excess of four times actual damages is Constitutionally excessive, our review will be limited to reviewing the evidence in regard to the amount of exemplary damages which is four times actual damages. In considering factual sufficiency of the evidence to support an amount of exemplary damages we review all the evidence in regard to (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, (5) the extent to which such conduct offends a public sense of justice and propri-

ety, and (6) the net worth of the defendant. *See* TCPRC § 41.011; *Kraus,* 616 S.W.2d at 910. In doing so, we will not repeat all the evidence set out previously in our opinion, but we refer the parties to those discussions. In relating the evidence to the above-referenced factors, however, we note that very few of the facts were disputed. For instance, Sterquell and Harris agreed that Archer had never lied to them and had always done what he said he would do in their several dealings over the years. Archer testified, and Sterquell concurred, that contrary to the recitation in the Settlement and Partition agreement drafted by Archer's attorney Hazlewood, Sterquell did not agree in December, 1993, to sell his partnership interest. Archer was not aware of any written permission by Sterquell for Harris to sell his interest in December. Archer understood that the partnership agreement contained a provision requiring prior written permission of the other partners for sale of a partnership interest, and providing that an attempted sale of a partnership interest in violation of the provision was void. Archer testified that he considered that as of the end of December, 1993 and at all times up until execution of the July 1st agreements, Sterquell, Harris and he were partners. Archer agreed at trial that as a partner he owed fiduciary duties to Sterquell and Harris which included the duties to (1) ensure the July 1, 1994, transaction was fair and equitable to his partners Sterquell and Harris, (2) make reasonable use of the confidence that his partners placed in him, (3) act in the utmost good faith and exercise the most scrupulous honesty towards Sterquell and Harris, and (4) not use his position to gain benefit for himself. There was no evidence before the jury that Archer's conduct was motivated by need or any goal other than to secure all profits from sale of the airport building for himself and his brother, Branch, at the expense of

Sterquell and Harris. Unchallenged evidence was admitted at the exemplary damages phase as to attorney's fees for Sterquell and Harris to prosecute their case.

We also consider the evidence as to the nature of the wrong, the character of Archer's conduct involved, the degree of Archer's culpability, and the extent to which his conduct offends a public sense of justice and propriety. The evidence was sufficient for the jury to have determined that Archer's actions in consciously concealing the AEDC negotiations from Sterquell and Harris via, in part, a concealment of the true facts from his own attorney when Archer sought advice about disclosing the AEDC negotiations, were a calculated violation of fiduciary duties of which he was aware, to the disadvantage of two men who had come to trust Archer through prior years and multiple business dealings and who brought the airport building investment opportunity to Archer initially.

In considering the evidence as to the situation and sensibilities of the parties concerned, we note that Archer attempted to justify his actions by claiming duties to his deceased brother Branch in regard to the airport building property. Archer, however, did not dispute the testimony of Sterquell and Harris that through their prior business dealings with Archer they came to trust him, they brought the airport building investment to him originally, and, because of their prior business relationships, had no cause not to trust him to both fulfill his fiduciary duties as a partner and to deal with them fairly.

The evidence showed that Archer's net worth at the time of trial exceeded $2,000,000 individually, and that his PST had net value of over $4,300,000. Testimony indicated that he had unspecified contingent liabilities based on loans he had personally guaranteed.

During final summation at the exemplary damages portion of the trial, counsel for Sterqulll and Harris did not attempt to stir the emotions or passion of the jury. Counsel made a simple plea that the jury should follow the jury charge and award exemplary damages sufficient to appropriately punish Archer and to serve as an example to the community. Counsel did not suggest any amount or ratio of exemplary damages to actual damages. The record does not indicate that the award was the result of passion or prejudice on the part of the jury.

In considering all the evidence, we conclude that the evidence is factually sufficient to support the jury's exercise of discretion to award exemplary damages against Archer and in favor of Sterquell. Accordingly, we sustain Archer's sixth issue to the extent it challenges the Constitutionality of exemplary damages awarded in excess of four times actual damages. We overrule the issue to the extent it challenges the factual sufficiency of the evidence to support the award.

As set out hereafter in our Conclusion, subject to remittitur by Sterquell of exemplary damages awarded in excess of four times Sterquell's actual damages, the judgment in favor of Sterquell will be affirmed.

## III. HARRIS'S APPEAL

Harris appeals the trial court's refusal to enter judgment in his favor for the actual and exemplary damages found by the jury. He premises his argument on jury findings that Sterquell did not consent in writing for Harris to sell his interest in the partnership or building, and that Archer breached his fiduciary duty to Harris. He urges that the jury finding in response to question 15 that Harris agreed to sell his interest in the partnership and airport building before the

AEDC expressed an interest to Archer in purchasing the building, was improperly submitted, was not controlling, was without evidentiary support and was rendered moot by the jury's finding in question 17 that Sterquell had not given his consent in writing for Harris to sell his interest. Harris claims that question 15 was improperly submitted because (1) it was not submitted conditioned on a finding that Sterquell had given his prior written consent to a sale; (2) Harris objected to submission of the question without such condition (among other objections to the question's submission); (3) the jury finding that Harris agreed to sell his interest is immaterial; and (4) without a finding that Sterquell gave his prior written consent, the terms of the partnership agreement make any purported sale or transfer void. Harris further notes that a mere agreement to sell would not terminate his status as a partner until the sale was consummated.

Archer seeks to sustain the trial court's entry of the take-nothing judgment for the same reasons, in part, that he asserts in appealing the judgment in favor of Sterquell. Without detailed elaboration of the parts of the cross-points which are substantively the same as his assertions as to Sterquell, and for the reasons stated in our disposition of Archer's appeal as to Sterquell, we overrule those respective parts of Archer's cross-points three, four and five that we do not specifically address hereafter.

In addition to the issues which are in common with his appeal as to Sterquell, Archer urges that the judgment as to Harris should be affirmed for the following reasons: (1) Sterquell consented to the sale of Harris's partnership interest and the jury finding that Sterquell did not express his consent in writing for Harris to sell is not supported by legally or factu- ally sufficient evidence (reply point one); (2) the jury finding that Harris agreed to sell his partnership interest is a controlling finding and was properly submitted (reply point two); (3) Archer consented to Harris's December, 1993, sale of his partnership interest to Branch Archer, therefore any fiduciary duty owed by Archer to Harris was terminated by the sale in December (cross-point two, subpart one); (4) Harris materially breached the partnership agreement by selling his interest without Sterquell's consent, thereby dissolving the partnership and terminating any duty on behalf of Archer to disclose the AEDC offer (cross-point two, subpart two); (5) Harris is estopped from claiming that a breach of fiduciary duty or fraud on the part of Archer induced Harris to sell his partnership interest in July, 1994, because by executing the July 1st agreements Harris ratified the December, 1993, sale of his interest (cross-point five, subpoint two); (6) Harris's execution of documents in December, 1993, transferring his partnership interest and Harris's acceptance of Branch Archer's check effected a dissolution of the partnership (cross-point five, subpart three); and (7) the jury's answers to question 2 (Archer failed to comply with his fiduciary duty to Harris), question 5 (Archer committed fraud against Harris), and question 7 (actual damages) are not supported by factually sufficient evidence (cross-point six). As cross-point one, Archer asserts that the exemplary damages awarded by the jury are not appropriate under the facts, are Constitutionally excessive, and should be limited to four times actual damages if judgment is rendered for Harris. We will consider the positions of Harris and Archer in a logical, not numerically sequential, manner.

## A. HARRIS'S ASSERTIONS

The jury's findings warrant judgment for Harris unless the trial court was cor-

rect in granting judgment NOV on the basis of the jury's finding in response to question 15. We will first address Harris's assertion that the answer to question 15 should have been disregarded.

A proper jury question must be properly submitted, supported by evidence and call for a material finding. *See Southeastern Pipe Line Co., v. Tichacek,* 997 S.W.2d 166, 172 (Tex.1999). The jury's answer to question 15 (the finding that Harris agreed to sell his partnership interest before the AEDC expressed an interest in purchasing the building) is to be disregarded if it is without support in the evidence or if it is immaterial, as Harris contends. *Id.* A question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings. *Id.*

■ As part of his defense in the lawsuit, Archer asserted that the partnership agreement was void, and in the alternative, that he was entitled to rescission of the agreement. We have previously addressed such contentions in regard to Archer's appeal from the summary judgment and instructed verdict against him. In doing so, we determined that the partnership agreement was not void and that Archer was not entitled to rescind the agreement on the bases urged. Accordingly, the partners were bound by the partnership agreement and governed by the agreement's provision that a partner could not "sell, assign, transfer, encumber or otherwise dispose of any Partnership interest without the prior written consent of the other Partners, and may not pass title to any Partnership interest in the absence of such consent," and that any transfer prohibited by such provisions "shall be void."

Archer does not assert that Sterquell gave written consent prior to what Archer consistently refers to as the December, 1993, sale of Harris's interest to Branch Archer. Instead, Archer maintains, and the trial court agreed, that Sterquell's January 7, 1994, letter comprised written consent by Sterquell for Harris to sell his interest. Sterquell's letter, however, addressed an agreement between Sterquell and Richard Archer that if Sterquell did not purchase Harris's and Archer's interests by the end of January, then after the end of January, Richard Archer (not Branch Archer or Randall Kubiak, Trustee) would have the same option to purchase both Harris's and Sterquell's partnership interests. Archer does not maintain, and there is no evidence, that Harris sold his interest to Richard Archer pursuant to Sterquell's January 7th letter.

The trial court recognized, as do Archer, and Harris, that there is no evidence of written consent by Sterquell prior to Harris's December agreement to sell and Harris's execution of the transfer documents on December 22nd. On the other hand, there is evidence that Harris, Richard Archer, and Branch Archer intended and considered that the December activities did not result in a "sale" and transfer of Harris's partnership interest under the circumstances then in existence. In this regard, the record reflects that (1) Branch Archer testified he did not want to be partners with Sterquell, which would have been the result if Branch had validly purchased Harris's partnership interest in December; (2) Harris signed documents of sale to Randall Kubiak, Trustee, in December, but left the documents and Branch Archer's purchase money check with Richard Archer along with a note for Richard to keep the check and documents so that everything "Stays like it is until Steve signs everything needed"; (3) testimony

evidenced discussions between Richard Archer and Harris as to the absence of Sterquell's consent and its possible effect on the purported December sale of Harris's partnership interest; (4) via a letter dated January 3, 1994, Sterquell advised Harris and Allison that he did not desire to sell his partnership interest, but wanted to purchase Harris's interest, as well as that of Archer, on "the same terms and conditions that have been offered"; (5) in a letter to Sterquell dated February 19, 1994, Harris referenced Sterquell's failure to purchase Harris's and Archer's partnership interests in January and that "I'm now trying to sell my 1/3 interest to Richard Archer."

Question 15 is material[17] because it finds support in the evidence, and an agreement to sell, or meeting of the minds, between Harris and a purchaser of his partnership interest is an element of a valid sale of the interest. The submission, however, is defective because the question of whether Harris sold his interest with Sterquell's prior written consent was not submitted. See Tichacek, 997 S.W.2d at 172. Harris objected to the failure to submit the additional questions or instructions necessary to support Archer's defense.[18] Thus, there can be no deemed findings in support of the additional necessary findings. See Tex.R. Civ. P. 279. Furthermore, even if such additional findings had been made by the jury or by the trial court, there is no evidence to support the additional findings. Accordingly, there are neither sufficient jury findings nor evidence to support Archer's defense that Harris sold his partnership interest in compliance with the partnership agreement terms prior to Archer's negotiations with the AEDC, and that Archer did not owe Harris a fiduciary duty to disclose the negotiations. See Exxon Corp. v. Breezevale Ltd., 82 S.W.3d 429, 439 (Tex.App.-Dallas 2002, pet. denied).

The trial court erred in disregarding the findings in favor of Harris and rendering judgment for Archer based on the jury's answer to question 15.

## B. ARCHER'S REPLY AND CROSS–POINTS

### 1. Reply Point One: Sufficiency of the Evidence That Sterquell did not Consent in Writing for Harris to Sell

Archer's first reply point challenges the legal and factual sufficiency of the evidence to support the jury's finding via question 17 that Sterquell did not express in writing his consent for Harris to sell his interest in the partnership.

■■■ Sterquell did not dispute Archer's contention that Sterquell's letter of January 7, 1994, granted Richard Archer the right, at least for some period of time, to purchase both Harris's and Sterquell's partnership interests if Sterquell did not purchase Harris's and Archer's interests in January. The undisputed evidence, however, is that (1) Sterquell did not consent

---

17. Because we determine that Archer's submission was defective and because of our conclusion based on the submission, we do not consider whether the jury's finding that Harris agreed to sell his interest before the AEDC contacted Archer was rendered immaterial by the jury finding in response to question 17 that Sterquell did not consent in writing for Harris to sell. See our discussion of question 17 in regard to Archer's reply point one, infra.

18. We are not unmindful of Harris's citation to authorities holding that a jury cannot properly answer a question as to whether an effective transfer of partnership interest has occurred because the question is one of law. See Rodgers, 816 S.W.2d at 546; C & C Partners v. Sun Exploration & Prod. Co., 783 S.W.2d 707, 715 (Tex.App.-Dallas 1989, writ denied).

in writing to a sale by Harris prior to Harris's agreement to sell to Branch Archer and execution of the transfer documents dated December 22, 1993, and (2) Harris neither sold nor transferred his interest to Richard Archer pursuant to Sterquell's January 7, 1994, letter.

Under this record, question 17 was immaterial. *See Tichacek,* 997 S.W.2d at 172. The evidence conclusively proves that Sterquell did not give prior written consent, as required by the partnership agreement, to a transfer of Harris's partnership interest. Reply point one is overruled.

2. Reply Point Two: Did Harris's December Agreement to Sell Result in Termination of the Partnership?

Reply point two urges that the jury finding in response to question 15 that Harris agreed to sell his partnership interest before the AEDC contacted Archer is a controlling finding, properly submitted, and resulted in termination of the partnership.

■ The facts surrounding Harris's undisputed December, 1993, agreement to sell his interest to Branch Archer, whether an absolute or contingent agreement, do not support Archer's claim. Harris's agreement did not terminate the partnership absent some additional action and expression of intent by Harris. *See M.R. Champion, Inc.,* 904 S.W.2d at 618; *Rodgers,* 816 S.W.2d at 547. Archer's reply point two is overruled.

3. Cross–Point Two: Archer's Fiduciary Duties Were Terminated by Archer's Consent to Harris's Agreement to Sell

■ In his cross-point two, Archer advances two bases for our affirming the take-nothing judgment as to Harris. First, Archer contends that because Archer consented to Harris's December, 1993,

"sale" of his partnership interest, as a matter of law Archer's fiduciary duties to Harris as a partner were terminated by Harris's "wrongful actions" in transferring his partnership interest in violation of the partnership agreement. Archer claims that Harris's actions were wrongful as to Archer because Archer believed and relied on Harris having received consent from Sterquell to transfer Harris's interest. However, Archer's assertions that he relied on Harris's having received consent from Sterquell and Archer's conclusion that Harris intended to wrongfully transfer his partnership interest without Sterquell's consent are without foundation on a jury finding. The record contains evidence that, at a minimum, creates fact questions on both matters. Nor does Archer cite authority for the proposition that his verbal consent for Harris to sell his partnership interest effected a dissolution of the partnership, other than a law review article which criticizes the *Rodgers* decision and which suggests that a transfer of a partnership interest in violation of specific language of the partnership agreement should be dealt with as a wrongful dissolution.

■ We disagree with Archer's position. The provision agreed to by the parties in their partnership agreement as to the effect of an attempted or actual transfer of a partnership interest without prior written consent of the other partners is clear. The partners agreed that such a transfer would be void. Thus, the documents executed by Harris in December, 1993, transferring his partnership interest to Randall Kubiak, Trustee, were void. *See Rodgers,* 816 S.W.2d at 547; *Kelly v. Kelly,* 411 S.W.2d 953, 954–55 (Tex.Civ. App.-Houston 1967, writ ref'd n.r.e.). Because the December, 1993, documents of transfer were void, Harris did not effectively transfer his partnership interest in

December, 1993. *See Rodgers*, 816 S.W.2d at 547. Nor did he transfer them thereafter, until July, 1994. Archer and Harris continued to be partners until the July 1, 1994, sale of Harris's partnership interest. *Id.* Archer continued to owe fiduciary duties of a partner to Harris until the July 1st sale terminated Harris's status as a partner. *Id.*

Next, Archer contends that Harris materially breached the partnership agreement when he sold his interest without Sterquell's consent, because the agreement is clear that such a sale is prohibited. Archer reasons that the material breach effected a dissolution of the partnership and that he thereafter owed no duty to offer his former partners a business opportunity which arose after the partnership terminated. He relies on *M.R. Champion, Inc.*

We disagree with Archer's reading of *Champion.* In *Champion*, the jury found that Mizell, a partner, breached the partnership agreement and also conducted himself in a way that it was not reasonably practicable to carry on partnership business. Based on such jury finding, the trial court found that Mizell's conduct effected a termination of the partnership. *Champion* does not hold that a material breach of a partnership agreement, without more, effects a dissolution of the partnership. *See* Tex.Rev.Civ. Stat. Ann. art. 6132b–6.01(b)(5) (Vernon Supp.2004) and its predecessor statute, art. 6132b § 27; *M.R. Champion, Inc.*, 904 S.W.2d at 618, n. 1.

Moreover, Archer assumes, without a jury finding to support his position, that Harris's December actions constituted a material breach of the agreement because Harris intended to sell his interest without Sterquell's consent. Harris contests that assumption and points to evidence in the record which supports his position that his "sale" to Branch Archer was contingent on Sterquell's consent and concurrent sale of Sterquell's partnership interest to Branch Archer. Unlike the record in *M.R. Champion, Inc.*, this record does not contain a jury finding that Harris both breached the partnership agreement and exhibited other conduct sufficient to warrant termination of the partnership.

We overrule Archer's cross-point two.

4. Cross–Point Five: Did Harris Release His Claims, Ratify the December Transaction or Dissolve the Partnership?

By cross-point five, Archer presents three bases for his claim that the judgment as to Harris should be affirmed. Subpoint one urges that Harris released his claims for breach of fiduciary duty by execution of the July 1, 1994, agreements. We have addressed and overruled the same assertion previously in determining Archer's fourth issue as to Sterquell. For the reasons expressed previously, we conclude that subpoint one is without merit.

Subpoint two asserts that Harris is estopped from claiming that a breach of fiduciary duty or fraud on the part of Archer induced Harris to sell his partnership interest in July, 1994, because by executing the July 1st agreements Harris ratified the December, 1993, sale of his interest. Archer cites *Steubner Realty 19* for the position that Harris is precluded from asserting that he did not agree in December, 1993, to sell his partnership interest because such a position is inconsistent with the recitation in the July 1st agreements that Harris was confirming the December agreement. Archer's premise is faulty.

Harris claims that although he agreed to sell his interest to Branch Archer in December, the agreement was subject to Sterquell's also selling, and Sterquell's

consent to the sale. Harris further claims that in December, January and February, Sterquell, Archer and Harris all recognized that according to the language of the partnership agreement, (1) Harris's December agreement could not be consummated because Sterquell did not consent; (2) any attempt to sell or transfer Harris's interest without Sterquell's written permission was void; and (3) Harris remained as the owner of his partnership interest.

The recitation in the July agreements was not inconsistent with Harris's position that he made a contingent agreement in December to sell to Branch Archer, the agreement was not consummated, and that Archer and Harris continued to be partners until the July 1st agreements were executed. The recitations did not estop Harris from claiming that he was fraudulently induced to execute the July 1st agreements.

■ Archer does not cite authority for or argue his statement in subpoint two that execution of the July 1st agreements and failure to seek their rescission was ratification of the December "sale." To the extent that ratification is urged in subpoint two, it is inadequately briefed.

Subpoint three asserts that Harris's execution of transfer documents in December effected a dissolution of the partnership. This is a shade of the argument Archer presented in cross-point two, subpart two, and which we found to lack merit. In this subpoint, Archer references authorities cited in his fourth issue as to Sterquell by which he urged that Sterquell dissolved the partnership via his January 7, 1994, letter offering to buy the interests of Harris and Archer. Archer presents his contention without referencing language in the documents Harris signed on December 22nd that manifested Harris's express will to dissolve the partnership, or a jury finding that in addition to merely executing the documents, Harris intended to dissolve the partnership or that Harris conducted himself in such a manner as to effect dissolution. *See M.R. Champion,* 904 S.W.2d at 618 and n. 1. The evidence does not establish as a matter of law that Harris dissolved the partnership by execution of the documents. Subpoint three is without merit.

We overrule cross-point five.

5. **Cross–Point Six: Factual Insufficiency of the Evidence that Archer Breached a Fiduciary Duty, Committed Fraud and Caused Actual Damages**

■ By cross-point six Archer challenges the factual sufficiency of the evidence to support the jury findings in response to jury questions two, five and seven. In response to question two the jury found that Archer failed to comply with his fiduciary duty to Harris; in response to question five, that Archer committed fraud against Harris; and in response to question seven, that Harris was actually damaged in the amount of $101,947.50. Archer does not cite authorities and does not argue in support of his assertion, other than positing that the findings are against the overwhelming weight of the evidence "for the foregoing reasons and considering the evidence already described." The cross-point is inadequately briefed and fails to present error for review. *See* TRAP 38.1(h); *General Serv. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 598 n. 1 (Tex.2001) (citing former TRAP 74(f), now TRAP 38.1(h)); *Fredonia State Bank v. General Am. Life Ins. Co.,* 881 S.W.2d 279, 283–84 (Tex.1994).

6. **Cross–Point One: Exemplary Damages**

Archer's first cross-point challenges the jury's exemplary damages award in favor

of Harris as being Constitutionally excessive and based on factually insufficient evidence. He relies in the main on the same arguments and authorities as he presented in his similar challenge to the exemplary damages awarded to Sterquell.

Our prior review of the *Gore* guideposts in regard to Sterquell's exemplary damages award is applicable to the excessiveness issue as to Harris, with one exception. The exception is one part of the first *Gore* guidepost. In considering the degree of reprehensibility of the defendant's actions, we are to consider, in part, the financial vulnerability of the target of the defendant's conduct. *Campbell,* 123 S.Ct. at 1521. In doing so as to Harris, we conclude that the evidence does not show he was in a vulnerable financial position. For example, the evidence did not show that he was depending on the partnership for income or living expenses, was expressing any concerns over remaining in the partnership with the attendant financial obligations of a partner, or was anxious to realize profit from the venture because of debts or financial obligations. His PST was the actual partner in the partnership. Harris was retired from his banking career. Over a year before Archer called him to come to Amarillo to work on settlement of the partnership accounts, he had moved away from the Amarillo area where the partnership property was located. Our review of Harris's financial vulnerability, taken in conjunction with our reasoning as previously set out in regard to the Constitutional excessiveness of the exemplary damages awarded against Archer yields the conclusion that the exemplary damages in excess of four times Harris's actual economic damages exceeds the ratio permitted by the Due Process Clause of the Fourteenth Amendment. *See id.* at 1524; *Apache,* 960 S.W.2d at 750. Because we sustain Archer's issue on the basis of the Federal Constitution's Due Process Clause, we do not consider his arguments as to the Texas Constitution. *See* TRAP 47.1.

In addressing Archer's contention that the evidence is factually insufficient to support the exemplary damages award, and for the reasons set out in our review of exemplary damages awarded to Sterquell, we review the evidence to determine if it is factually sufficient to support exemplary damages which are four times actual damages. For the factors we consider in determining factual sufficiency of the evidence and our analysis of the evidence as to those factors, we refer the parties to our discussion of the same contention as to Sterquell.

In addition to contesting the factual sufficiency of the evidence to support exemplary damages in favor of Harris on the same basic bases as he did as to Sterquell, Archer, in part, emphasizes that the facts as to Harris's agreement to sell his partnership interest differ from those as to Sterquell. Archer points to facts showing that in December, 1993, Harris agreed to sell his partnership interest, executed transfer documents, and cashed the check from Branch Archer. Archer then argues that it was legitimate and reasonable for him to believe Harris's actions constituted a completed transaction, Archer had a good faith belief that Harris had sold his interest to Branch in December, and that such matters militate against exemplary damages which are four times actual damages.

The evidence on which Archer bases his arguments, however, are only part of that before the jury. We must consider all the evidence in reviewing factual sufficiency to support the exemplary damages. Archer's assertions as to his subjective beliefs and good faith and reasonableness in holding those beliefs were for the jury to evaluate

in conjunction with the remainder of the evidence. Our review of all the evidence, as set out here and in prior parts of the opinion, leads us to the conclusion that the evidence is factually sufficient to support the award of four times actual damages as exemplary damages against Archer and in favor of Harris.

We sustain Archer's first cross-point to the extent it challenges the Constitutional excessiveness of the exemplary damages award. We overrule the cross-point to the extent it challenges the factual sufficiency of the evidence.

## CONCLUSION

Archer has requested that if the result of our review results in judgment for exemplary damages against him, and if we determine that the exemplary damages awards are excessive, then we order a remittitur of the excessive amount of the damages. *See Apache Corp.,* 960 S.W.2d at 750. Neither Sterquell nor Harris have sought rendition of judgment for the amount of exemplary damages which are not excessive, in the event we were to find the exemplary damages excessive to some degree and also determined that judgment against Archer was proper. We are limited to the relief sought by the parties. *See Stevens v. National Educ. Ctrs. Inc.,* 11 S.W.3d 185, 186 (Tex.2000). Accordingly, even if it were proper to do so otherwise, we may not render judgment for Sterquell or Harris for the amounts of exemplary damages which are not Constitutionally excessive.

If, within 20 days from the date of this opinion, Sterquell remits the exemplary damages in excess of $407,790 which were awarded to him, we will affirm the judgment as to him. Otherwise, the judgment as to Sterquell will be reversed and remanded to the trial court.

We reverse the trial court judgment as to Harris. If, within 20 days from the date of this opinion, Harris remits the exemplary damages in excess of $407,790 which the jury awarded to him, we will render judgment in favor of Harris for $101,947.50 actual damages and $407,790 exemplary damages. Otherwise, the claims as to Harris will be remanded to the trial court.