# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00525-CV

---

**New Horizons Ranch and Center, Inc., Appellant**

**v.**

**Brandon Grebe, Appellee**

---

### FROM THE 35TH DISTRICT COURT OF MILLS COUNTY
### NO. 19-03-7054, THE HONORABLE MIKE SMITH, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

New Horizons Ranch and Center, Inc. appeals from the trial court's final judgment rendered after a jury trial. The judgment awarded actual damages, exemplary damages, and attorney's fees to Brandon Grebe after the jury found that New Horizons converted and damaged his personal belongings after terminating his employment. For the following reasons, we reverse the judgment in part and render a take-nothing judgment on Grebe's claim for intentional infliction of emotional distress and exemplary damages awarded for that claim and affirm the judgment in all other respects.

## BACKGROUND

*Factual and procedural background*

New Horizons was established in 1971 by Del Barnett, Grebe's father-in-law, as a non-profit focused on caring for children that have been removed from their homes due to

abuse or neglect. It is headquartered in Abilene but has a residential facility for children in Goldthwaite, referred to by the parties as "the Ranch." Grebe began his employment with New Horizons in 1994 at the Ranch as a Child Development Specialist and eventually rose to the position of Director of Development. In January 2017, Grebe was abruptly placed on administrative leave and then fired about ten days later. When New Horizons placed Grebe on administrative leave, it barred him from entering the Ranch, where he maintained an office, for any reason, including to retrieve his personal belongings.

For several months thereafter, Grebe attempted to retrieve his belongings through repeated demands of his counsel. In June 2017, Grebe—as alleged in his petition—received at his residence in Goldthwaite "four dilapidated, weather-worn boxes totaling 240 lbs," which New Horizons had shipped to him via UPS from its Abilene office. Upon opening the boxes, Grebe "immediately identified large items like an autographed guitar and framed artwork that were missing" and "identified obvious efforts to mistreat and damage" his personal belongings.

Grebe then filed this lawsuit against New Horizons to recover for the damage to his belongings and for emotional distress caused thereby. In his petition, Grebe raised claims for conversion, trespass to chattels, breach of implied bailment, liability under the Texas Theft Liability Act (TTLA), *see generally* Tex. Civ. Prac. & Rem. Code §§ 134.001–.005, and intentional infliction of emotional distress (IIED). He also sought recovery for his attorney's fees under the TTLA, *see id.* § 134.005(b), and exemplary damages, *see id.* § 41.003 ("Standards for Recovery of Exemplary Damages"). After filing a general denial, New Horizons filed counterclaims against Grebe, alleging that he breached a fiduciary duty owed to it by diverting donations and proceeds away from the company and violated a non-solicitation and non-compete agreement by soliciting donors' contributions to another charity—Funds for Children—an

2

organization founded and controlled by Barnett. New Horizons further alleged that Grebe was terminated for violating the terms of his administrative leave by contacting New Horizons' donors. Finally, New Horizons alleged that Grebe committed fraud by representing to New Horizons and the public that proceeds from the most recent New Horizons Music Fest (an annual event) would benefit New Horizons when, in fact, Grebe diverted some or all of those proceeds to Funds for Children, which was raising money to "buy back" the Ranch from New Horizons.[1]

The trial court denied both parties' motions for summary judgment and conducted a jury trial in March 2023. The jury answered "yes" to the five charge questions asking whether New Horizons had (1) converted Grebe's property; (2) committed a trespass to Grebe's property; (3) knowingly taken Grebe's property into its possession or control, failed to exercise ordinary care to ensure its safety, and proximately caused it to be damaged (implied bailment); (4) committed theft (as defined in the TTLA); and (5) intentionally inflicted on Grebe severe emotional distress. The jury awarded damages for each of the first three claims in the following amounts: $4,790 for the fair market value of the property and $26,750 for the loss of the property's sentimental value; it awarded $4,790 for the market value of Grebe's property for his TTLA claim. For IIED, the jury awarded $250,000 for mental anguish sustained in the past and $250,000 for mental anguish sustained in the future. The jury was instructed to consider only severe emotional distress, if any, that occurred on or after March 5, 2017, and to not consider mental anguish, if any, that resulted from termination of employment.[2] The jury answered

[1] In March 2017, New Horizons filed a lawsuit in Taylor County against Funds for Children and Grebe concerning some of the same allegations. That lawsuit was transferred to Mills County, Funds for Children prevailed on summary judgment, and New Horizons then non-suited its claims against Grebe.

[2] March 5, 2017, was when New Horizons filed its lawsuit against Funds for Children and Grebe.

3

unanimously "yes" to the following question pertaining to exemplary damages: "Did New Horizons . . . act with actual malice and intentionally inflict severe emotional distress on . . . Grebe by clear and convincing evidence?" The jury found, unanimously, that $1,500,000 should be assessed against New Horizons as exemplary damages for Grebe's IIED claim. The jury also determined that exemplary damages of $750,000 and attorney's fees of $43,000 should be awarded for the TTLA claim. *See id.* §§ 41.003 (exemplary damages), 134.005 (attorney's fees). The jury answered "no" to all the questions pertaining to whether Grebe was liable for any of New Horizons' claims. It also answered "no" to whether UPS's actions proximately caused damage to Grebe's property.[3]

Following the verdict, New Horizons filed a motion to disregard jury findings in which it challenged the IIED award as being unavailable when other tort remedies exist and because the conduct at issue failed to rise to the legal threshold of "extreme and outrageous." New Horizons also challenged the sufficiency of the evidence supporting the existence and amount of past and future mental-anguish damages, the award of attorney's fees for failure to properly segregate, and the exemplary damages for exceeding the statutory caps. The trial court declined to disregard any of the jury's findings as requested by New Horizons but did apply the statutory caps on exemplary damages. *See id.* § 41.008 ("Limitation on Amount of Recovery"). Accordingly, the trial court signed a judgment awarding Grebe (1) $4,790 for stolen, damaged, and destroyed property for the TTLA claim; (2) $250,000 in past mental-anguish damages for IIED; (3) $250,000 in future mental-anguish damages for IIED; (4) exemplary damages for IIED

---

[3] The trial court had previously granted New Horizons' motion to designate UPS as a responsible third party.

of $500,000; (5) exemplary damages for the TTLA claim of $200,000; and (6) attorney's fees for the TTLA claim of $43,000.

New Horizons filed a Motion for New Trial, to Reconsider, and to Modify Judgment, incorporating its motion to disregard and adding new arguments, including that the exemplary-damages awards violate its due-process rights because they are grossly excessive and arbitrary. The trial court denied New Horizons' motion, and New Horizons perfected this appeal.

### Evidence at trial

#### Grebe's testimony

Grebe testified that he received four dilapidated boxes from New Horizons, via UPS, in June 2017, about five months after he was terminated. The boxes contained some, but not all, of the belongings that were left in his office at the Ranch—some items were still outstanding as of trial—and the boxes arrived two at a time on consecutive days. The boxes were large and heavy, one close to 100 pounds. As soon as he opened the larger of the first two boxes, he "was immediately in shock." His belongings were "not like just a little bit destroyed, but they were absolutely destroyed." Grebe "knew right away that this was not because of shipping" because although there "was a little bit of bubble wrap," it "didn't seem like there was any . . . purpose to it." It looked "deliberate . . . like somebody destroyed my items to get at me."

The two large boxes that arrived on the second day had been packaged inside newer, sturdier boxes. One of the inner dilapidated boxes contained a "dead baby bird" at the top when Grebe opened it, and the box had been sealed inside a large plastic bag before being placed in the outer, newer box—Grebe presumed UPS had done so to "keep the smell enclosed

5

as much as possible" because the smell coming from the bird was "god-awful." The dilapidated inner boxes had markings indicating they had originally been obtained from U-Haul. Grebe explained that the inner boxes looked "bad" and were "beat up bad," having "a sag" to them and gaping holes, as if they had been left outside in the weather for five months, allowing "mice and other things" to get in them, evidenced by "mouse droppings" he saw inside. As for his belongings, "it looked like somebody took [the] boxes into [his] office and threw [his] items from across the room into those boxes and then packaged them up and sent them." It looked to him as if someone had done so "deliberately," including placing a glass-framed photo of his wife on their wedding day on the very bottom of a box under heavy items, and it felt to him like it was an "attack" and a "vendetta," like "they were trying to get [him] for whatever reason." It was "without a doubt a deliberate act against" him because there could be no other explanation, based on the condition of the boxes, their contents, and how they were packed. Several of the items in the boxes had obvious water damage, including some framed documents and photos (whose glass covers had been broken), revealing that "they had been soaked enough so that [the items] bent and took the shape of the box."

Grebe explained that the basis of his claim for mental anguish and severe emotional distress is that it took several months for New Horizons to return his belongings and that when he did receive them, they were destroyed. He testified that his receipt of the four boxes was "devastating" and "the most traumatic thing [he's] been through." He experienced "severe stress and anxiety and an enormous amount of worry," both for his family and for New Horizons, because it seemed like New Horizons was "being destroyed." His "heart raced all the time" and he thought he "was gonna have a heart attack." He experienced breathing difficulties and sleeping problems, including nightmares. Because he was unemployed, he did not have the

6

money to pay for a therapist, so he "leaned on his friends" who are trained therapists: his wife, his father-in-law, Laurel Jones, and Jerry Fleming. "With their help, [he has] been able to get through it." Grebe testified that one of the items he has yet to receive from New Horizons is a limited-edition artwork that a colleague had given to him when he was recommended for the position of Development Director, although he could not remember everything that he was still missing. Grebe's lawyers corresponded at least three times with the attorneys for New Horizons—on March 10, April 12, and June 8, 2017—demanding the return of Grebe's personal belongings, but he did not receive any items until June 14, 2017.

One of the recurring nightmares Grebe had, when he woke up in the middle of the night sweating and feeling his heart race, was that he would not "be able to provide for [his] family." Along with the fear of not being able to provide financially for his family he also experienced worry and fear about "the attack that New Horizons had done on" him, his family, his wife, and his father-in-law and the "legacy" of the organization that his father-in-law had founded. He "still worries" today about the possibility that New Horizons will "be destroyed."

Grebe testified about New Horizons' CEO Michael Redden's hiring of Hollie Jo White as Development Director in mid-2016.[4] He explained that he felt "agitated" about the hiring because he believed that White had "zero" fundraising experience and that although he had been with New Horizons for twenty-two years, Redden was "trying to get rid" of him. In a meeting with White a few months later, Grebe decided to "air out the dirty laundry" and share with her some things about New Horizons' operations and about his feeling that things "were changing" and it "just didn't feel right." He told White that he believed Redden "has been out to

---

[4] The record is not clear what position or title Grebe had after White became Development Director, but he appears to have been doing essentially the same type of work for New Horizons as he had been doing before White's hiring.

get [him] for a long time" and "doesn't like" him. At the meeting, he told White about Funds for Children's involvement with the Music Fest and how the Music Fest committee had decided to run the event "through" Funds for Children "because of the liability issues" and the inability of New Horizons to obtain enough insurance to cover the event.

*Photographic evidence*

Numerous photos of the cardboard boxes were admitted into evidence. Grebe's characterization of the boxes as being "dilapidated" is consistent with the photos. For example, the first two boxes appear very old, and their top surfaces appear to have had the upper layer of paper coating removed in some locations and areas where it appears that tape that had previously been applied had been removed. The two newer-looking, outer boxes that arrived the next day reveal inner boxes in a much more dilapidated state than the two boxes received the first day. Like the first two boxes, these inner boxes also appear to have had previously applied tape removed. The inner cardboard box that contained the dead bird showed that a portion of the top layer of the box's cardboard was removed, exposing the corrugation underneath. This removed top layer was where a "to" address would typically appear, and Grebe's "to" address was instead handwritten just above that area, on top of the box seam and over or under the clear packaging tape sealing the box. One of these inner boxes was labeled with a UPS sticker indicting a weight of ninety-one pounds; the sticker on the other indicated a weight of eighty pounds.

The contents of the boxes are in shambles, with broken ceramics, pottery, and glass strewn throughout; torn and water-damaged paperwork and photographs; books and other heavy items mixed in with fragile items, apparently not segregated by item type or fragility. One photo depicts the dead bird, and in others there is intermittent bubble wrap that does not appear

8

to be wrapping any particular items or to have been utilized in a manner that would protect fragile items.

*Holli Grebe's testimony*

Grebe's wife, Holli Grebe, testified that she also had worked at New Horizons, for eighteen years, and stopped working there in May 2017 after Grebe was terminated. Her office at the Ranch was about "15 feet" from Grebe's, but she was never permitted inside his office after he was terminated and had never been informed that she could pick up his belongings, despite her request to do so. She witnessed Grebe's opening of the second two boxes, which arrived a day later than the first two. She described it as "just devastation." She said that her eight-year-old child "could have done a better job" of wrapping the items to prepare them for shipment. She and Grebe did not even have to unwrap items to see that they were broken; they simply "could just look down in the box and see." Even though belongings are "just things," Holli explained that for her and Grebe, "it was about a lifetime of work at New Horizons," and they both had put "everything [they] had into that place," and "it was just like no one cared."

Holli described Grebe's reaction to receiving the boxes as "shock, devastation, kind of just disbelief" or "violation." He felt "hopelessness" and "worry," especially since he had lost his job. Grebe's emotional reaction to opening the boxes was "absolutely" not just in response to "what was done" to his belongings but also in response to "who did the act." Grebe was having "physical reactions" such as "breaking out in hives" and thinking he was having a heart attack—which was likely a panic attack—plus rapid heartbeats and excessive sweating. During that period, Grebe was in "a daze" and not sleeping well, having nightmares, and feeling dizzy and unable to breathe, often without warning. Holli explained that Grebe experienced

9

"utter sadness," depression, and anxiety. Such symptoms occurred at the time of receipt of the boxes and persisted afterwards for a period. She clarified that "some things kind of had been . . . going on" already before they received the boxes: Grebe had lost his job, and they had been "sued as a family" by New Horizons. Thus, after receiving the boxes, it felt like "it just kept going, and it was awful." Holli believed that Grebe's long-time connection to New Horizons had an impact on his "emotional response" when he received his damaged items. Holli also testified about the sentimental significance to Grebe of specific items that were damaged, noting that he is a "collector" and appreciates art and memorabilia because for him, accumulating things that "mean something" is important.

*Laurel Jones's testimony*

Jones had worked as a licensed professional counselor at New Horizons and knew Grebe and his wife and had worked with Grebe for decades. She had seen him a few times after his termination, and on one occasion when she visited the Grebes at their home (and before she was aware of the return of his items in a damaged state), the "primary issue" was Grebe's termination. Jones noticed that Grebe had had "some personality changes" and that rather than being "very upbeat, happy-go-lucky," he was saying that he didn't want to go to social activities, wasn't sleeping well, and felt like he couldn't "present himself in public." He also had been losing weight and had dark circles under his eyes.

*Gary Hazy's testimony*

Gary Hazy, the COO for New Horizons from 2014 to 2021, testified that he and Scott Anderson (another New Horizons employee) were tasked by Redden with traveling to Grebe's office (from Abilene) immediately after he was terminated; determining which items

were his, which ones were New Horizons', and which ones were of indeterminate ownership; creating a log of the items and categorizing them; and packing the items into cardboard boxes. He stated that they purchased boxes, tape, and bubble wrap at a Home Depot on the way from Abilene. The items that were "clearly" Grebe's were packed into boxes, taped shut, and left in a corner of his office at the Ranch. They packed up and brought to Abilene the items for which ownership was unclear. Hazy testified that he and Anderson packed up the items with care and that he treated the items "as if they were [his own]."

During his testimony, Hazy was presented with a photo of four rough-looking U-Haul boxes, wrapped in several pieces of wide black tape, sitting in an unidentified New Horizons office and near a sign indicating they belonged to Grebe. Hazy confirmed that the boxes depicted in the photo did not appear new. However, he clarified that they were not the same boxes in which Grebe's items were shipped, because New Horizons had used "new" U-Haul boxes when repacking the items they had brought to Abilene that they eventually determined belonged to Grebe and then when they shipped them via UPS. After the decision had been made to return the items in Abilene that New Horizons had determined belonged to Grebe, three employees—Anderson, White, and Cara Stone—were charged with logging, wrapping, and repacking everything for shipping to Grebe's home. While Hazy was not directly involved in that process, his office was just down the hall, and he observed that "they were being really meticulous," "very cautious with everything."

After the items were packed up, he and Anderson took the four boxes to Allied Parcel and Post for shipping via UPS to Grebe. Anderson handled the payment and details for the shipping, but Hazy remembered it being "very expensive"—"over a thousand dollars"—and that Anderson added "a bunch of insurance." Hazy described the large U-Haul boxes that he and

11

Anderson delivered to Allied Parcel and Post as being "new" and "in great condition"—"they couldn't be any newer." He conceded that the condition of the boxes that Grebe received—just a day or two later—as depicted in the photos was "different" from the condition of the boxes that he and Anderson dropped off with UPS. Unlike the "new" boxes they had dropped off, the boxes in the photos were "in really terrible condition."

*Michael Redden's testimony*

New Horizons CEO Redden testified that he had a "cordial" relationship with Grebe—"not unfriendly"—and had an even closer relationship with Holli Grebe, to whom he served as a mentor for a period. Redden testified about the events leading to Grebe's being placed on administrative leave, including Redden's previous directive to Grebe, in April 2016, to obtain advance approval if he wanted to change the procedures used for the annual Music Fest regarding its financing and how donations would be received and documented. In late 2016, after Redden had reviewed information on public tax returns, he became concerned that Grebe might have already changed donation procedures without informing him or obtaining approval and had permitted donations that should have come to New Horizons to be deposited into Funds for Children's bank account. Thereafter, Redden spoke with New Horizons' lawyers and other upper-level employees and scheduled meetings between those employees and New Horizons' lawyers. After Grebe met with the lawyers, Redden was still concerned, and, after New Horizons' lawyers spoke with Barnett, New Horizons placed Grebe on administrative leave. Shortly thereafter, when Redden became aware that Grebe had violated the terms of his administrative leave, he terminated Grebe's employment, and New Horizons later sued Funds for Children and Grebe.

With respect to returning Grebe's personal belongings, Redden "fully depended on the attorneys to work out those details," including how New Horizons would obtain the return of several items of its personal property that were in Grebe's possession. As for Grebe's belongings, Redden directed Anderson and Hazy to determine which items in Grebe's office were "clearly his" and to box those up and leave them in his Ranch office. For the other items, he directed Anderson and Hazy to pack them up and bring them to Abilene. Those items were stored in Redden's office in Abilene and were "never" stored outside. When the parties' respective lawyers reached an agreement about the return of Grebe's property, in June 2017, he enlisted the help of New Horizons employees White and Stone to repack the items and log everything that went into the boxes.

Redden was questioned about the same photo Hazy had been questioned about—the one depicting four rough-looking U-Haul boxes, wrapped in black tape, sitting in an unidentified office with a sign indicating they belonged to Grebe. Redden explained that the boxes contained the leftover items after the four large cardboard boxes had been shipped to Grebe via UPS for which New Horizons was still unsure whether they belonged to Grebe. The four boxes in the photo resemble the two outer boxes and two inner boxes—four total—that had already been delivered to Grebe.

On cross-examination, Redden admitted that on June 6, 2017, New Horizons learned that Grebe had been successful in his appeal of the Texas Workforce Commission's initial determination that he was not entitled to unemployment benefits and that his benefits would be charged to New Horizons' account, increasing the premiums it would have to pay to the State. Six days later, New Horizons delivered the four boxes via UPS to Grebe. When asked whether he was angry about the loss of the unemployment appeal and the near half a

13

million dollars that New Horizons had lost in donations since the termination of Grebe's employment, Redden replied, "Of course, I've had lots of feelings of this throughout, anger being one of them."

*Scott Anderson's testimony*

Anderson testified similarly to Redden about how New Horizons became concerned about possible diversion of donations to Funds for Children and provided specifics about the accounting and other documents he reviewed that supported New Horizons' suspicions.[5]  As to his participation in categorizing and packing up the items in Grebe's office, Anderson testified similarly to Hazy.  He explained that when he, White, and Stone sorted the items that Anderson and Hazy had brought to Abilene from the Ranch and selected the items to ship to Grebe, they realized that the boxes that he and Hazy had used to transport the items to Abilene "were not gonna work or [be] sturdy for shipping purposes."  Therefore, he, White, and Stone used new boxes in the repacking process, which were "sturdier than the old boxes," even though the "old boxes" had only made one trip (by truck) to Abilene.  Anderson, White, and Stone made a detailed inventory of everything that they repacked to send to Grebe, and everything was in "good condition," including the framed photo of Holli Grebe.  Anderson testified that they "either used bubble wrap, or in some cases some of that foam, and wrapped— every item that was breakable got wrapped pretty well."  It took the three of them "most of the day" to sort, inventory, and pack the four boxes.  The boxes were in "pristine" condition when he and Hazy dropped them off with UPS.

---

[5] Because New Horizons does not challenge any of the jury's findings or the judgment denying it relief on its claims against Grebe, we do not provide the details of Anderson's testimony relevant only to New Horizons' claims.

When presented with the photo of one of the two dilapidated boxes that had been packed inside another box, Anderson admitted that the inner box was one of the four that he had dropped off at UPS and that it was his handwriting on the address. Anderson admitted that the inner box appeared "crushed" but denied that it looked that way when he dropped it off at UPS.

*Cara Stone's and Hollie Jo White's Testimony*

Stone and White testified similarly and consistently regarding the procedures they used in sorting and repacking Grebe's personal belongings. Stone explained that the process "took several days" and that the three of them (Anderson, Stone, and White) "diligently" and carefully packed everything, taking "pride in it as if . . . it was [their] own stuff." The boxes they used were "brand new." Everything that was breakable "got bubble wrapped." Although Stone identified the inner boxes as the ones they had used and addressed, they were in "brand new" condition when they packed them up and dropped them off with UPS; they were not in the damaged condition in which they appeared to be in the photos of the boxes as received by Grebe.

White likewise testified that the sorting, inventorying, and repacking was a "long process"; that they used "brand new boxes from U-Haul"; and that they "bubble wrapped" things as they packed them, "very carefully, as if [they were] packing [their] own home." She also identified the inner boxes as the new ones they had assembled with tape and delivered for UPS shipment, but they did not look "damaged" and dilapidated at the time, unlike how they appear in the photos admitted into evidence.

**Other documentary evidence**

The trial court admitted a log compiled by Grebe identifying his belongings that were returned damaged by New Horizons. The log contains descriptions of the items, identifies

the damage, and places a value on each one. By way of example, the log contains the following entries:

- Description: Wife's Wedding Photo – Professionally framed. This is the only copy made like this and was a gift to me from my wife. Damage: Glass, Frame, Photo poked through. Value: $5,000.

- Description: Personalized Tom Landry Signed Football – This was a gift to me from Tom Frazier who was a mentor and fundraising colleague. Damage: Football scratched all over from broken glass. Value: $2,500.

- Description: Ira Kay Pottery – Plate – Was a gift from my mother, Ira Kay, and was displayed in my office on a plate stand. She was a well-known artist and is no longer alive. This piece was created by her. Damage: Cracked. Value: $2,500.

## DISCUSSION

In four issues, New Horizons argues that (1) Grebe's IIED claim is legally barred, (2) there is legally and factually insufficient evidence to support Grebe's IIED claim, and the exemplary damages awarded for each of the (3) TTLA claim and (4) IIED claim are unconstitutionally excessive.

### *IIED*

New Horizons' first two issues concern Grebe's IIED claim. In its first issue, New Horizons contends that the trial court erred in awarding judgment on the claim because (1) other recognized theories of recovery existed for the conduct at issue, barring recovery for IIED; and (2) there was insufficient evidence of "extreme and outrageous" conduct by New Horizons. In its second issue, New Horizons argues that there is legally and factually insufficient evidence to support both the existence and amount of damages awarded for Grebe's alleged past and future mental anguish. As explained below, we agree with New Horizons with respect to its first issue, which is dispositive as to whether Grebe may recover damages for his

16

IIED claim; however, we address New Horizons' evidentiary challenges to the IIED damages solely because such damages are relevant to our review of New Horizons' third issue (in which it challenges the award of exemplary damages for the TTLA claim).

The tort of IIED is a "gap-filler" tort "never intended to supplant or duplicate existing statutory or common-law remedies," and it has "exacting requirements." *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814–16 (Tex. 2005). When the plaintiff's claims stem from the same alleged conduct supporting other statutory or common-law claims, the plaintiff cannot assert them as IIED claims. *See id.* at 816. IIED is a judicially created tort "for the limited purpose of allowing recovery in those rare circumstances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Hoffman–La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004). The tort's "clear purpose" is "to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied." *Id.* The tort "should not be extended to circumvent the limitations placed on the recovery of mental anguish damages under more established tort doctrines." *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998).

In creating the tort, the supreme court "never intended that it be used to evade legislatively-imposed limitations on statutory claims or to supplant existing common law remedies. Properly cabined, the tort simply has no application when the 'actor intends to invade some other legally protected interest, even if emotional distress results.'" *Zeltwanger*, 144 S.W.3d at 447 (internal quotation marks omitted) (quoting *Standard Fruit*, 985 S.W.2d at 67). Where the gravamen of a plaintiff's complaint is really another tort, IIED should not be available. *Id.* (holding that because Texas Commission on Human Rights Act provided remedy

17

for same emotional damages caused by same discriminatory actions as those supporting IIED claim, "there is no remedial gap" and "thus no support" for jury's award of IIED damages). The determination of whether IIED is a proper claim is a "pure legal question" and therefore is reviewed de novo. *See id.* at 450.

The gravamen of Grebe's claim was the damage done to his property, the delay in the items' return, and the failure to return some items—recovery for which was already available under either his TTLA or common-law theories of conversion, trespass to property, and breach of implied bailment. He may not circumvent any limitations existing on recovery under those theories by asserting an IIED claim. *See Standard Fruit*, 985 S.W.2d at 68. Furthermore, Grebe did not introduce evidence that independently supported an IIED claim but rather, all his evidence of New Horizons' actionable conduct was directly related to and in support of his four other claims (for conversion, theft, breach of implied bailment, and trespass to property). Grebe's evidence at trial, particularly his testimony, demonstrated that his claim for mental anguish arose solely from the delay in delivery and intentional or reckless packaging of his belongings so as to damage or destroy them. This was the same evidence that supported his four other claims, and he did not introduce any evidence that independently supported an IIED claim. *See Doe v. Cruz*, 683 S.W.3d 475, 500 (Tex. App.—San Antonio 2023, no pet.) (holding that because plaintiff did not allege any factual basis for IIED claim other than same factual bases that he asserted to support claims for revenge porn, defamation, and tortious interference with contract, IIED claim was legally unavailable); *Patel v. Hussain*, 485 S.W.3d 153, 177 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (determining that gravamen of plaintiff's complaint "was fully encompassed by her invasion of privacy claims" and that because she had not identified evidence independently supporting IIED claim, such claim was legally unavailable);

18

*Oliphant v. Richards*, 167 S.W.3d 513, 517 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (affirming summary judgment on IIED claim because it was not based on facts independent of defamation claim).

Because Texas law provides other theories of redress for New Horizons' actions—theories that essentially equate to either conversion or intentional property damage—Grebe may not recover under his IIED claim. *See Creditwatch*, 157 S.W.3d at 816; *Bill Wyly Dev., Inc. v. Smith*, 680 S.W.3d 679, 689–90 (Tex. App.—Houston [14th Dist.] 2023, no pet.) (concluding that plaintiff's IIED claim was unavailable because it was based on same facts supporting other available claims providing legal remedies: trespass and malicious prosecution, and trial court thus erred in denying appellant's motion for directed verdict on IIED claim); *Mann v. Robles*, No. 09-19-00368-CV, 2021 WL 6138971, at *6 (Tex. App.—Beaumont Dec. 30, 2021, no pet.) (mem. op.) (concluding that because remedies through claims for trespass and intentional interference with property rights were available for challenged conduct—damaging property within easement and excluding easement owners from easement's use—IIED claim was not available, and trial court erred in failing to disregard jury's findings on IIED claim).

Furthermore, mental-anguish damages are recoverable under the TTLA and for intentional property damage, obviating the gap-filler tort of IIED. *See Beaumont v. Basham*, 205 S.W.3d 608, 620 (Tex. App.—Waco 2006, pet. denied) (concluding that mental-anguish damages were recoverable under TTLA when evidence showed defendants acted with malice); *Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 755–56 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (concluding that mental anguish stemming from intentional damage to property with sentimental value is recoverable). However, Grebe did not assert his

entitlement to mental-anguish damages under his TTLA or common-law claims and did not submit jury questions seeking such damages for those theories.

We sustain New Horizons' first issue and conclude that because the gravamen of Grebe's complaint was other torts related to theft and damage of personal property, the trial court erred in failing to disregard the jury's findings on the IIED claim and in awarding Grebe damages for it, including exemplary damages. *See Creditwatch*, 157 S.W.3d at 818; *Mann*, 2021 WL 6138971, at *6.

Only because it is relevant to our review of exemplary damages, we next address New Horizons' evidentiary-sufficiency challenges to the jury's awards of mental-anguish damages. The general rule is that there must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded. *See Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013). We agree with New Horizons that there is legally insufficient evidence to support any damages for future mental anguish. To recover damages for future mental anguish, the plaintiff must demonstrate a reasonable probability that he will suffer compensable mental anguish in the future. *See Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 916 (Tex. 2008). The record here is devoid of any evidence indicating that Grebe is likely to suffer mental anguish in the future. *See Anderson v. Durant*, 550 S.W.3d 605, 621 (Tex. 2018) (reversing jury's award of future-mental-anguish damages where record contained no evidence substantiating reasonable probability that plaintiff will continue to suffer mental anguish); *Paragon Hotel Corp. v. Ramirez*, 783 S.W.2d 654, 660–61 (Tex. App.—El Paso 1989, writ denied) (concluding that evidence supporting award for future mental anguish in wrongful-termination case was legally insufficient because it was based solely on inference and speculation about plaintiff's future employment status). All the evidence supporting Grebe's

20

mental anguish demonstrates that he experienced the anguish for an indeterminate period after his receipt of the boxes but that his symptoms had resolved by the time of trial (for example, he testified that he has "been able to get through" the experience with the help of his therapist friends and family), and neither he nor any experts opined on the likelihood of the symptoms recurring.

As for the jury's award for past mental anguish, we hold that there is legally sufficient evidence to support it. A damage award for mental anguish will survive a legal-sufficiency challenge when the record bears "direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish, thus establishing a substantial disruption in the plaintiff[']s daily routine," or when the record demonstrates "evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Anderson*, 550 S.W.3d at 619 (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)).

Evidence showed that Grebe experienced physical manifestations of his stress and anxiety, including breathing trouble, heart-racing, insomnia, nightmares, hives, panic attacks, and dizziness. Other witnesses corroborated the outward manifestations of those symptoms and their impact on his life, including that he exhibited personality changes, depression, anxiety, and weight loss. *Cf. Martin v. Beitler*, No. 03-13-00605-CV, 2015 WL 4197042, at *4–5 (Tex. App.—Austin July 7, 2015, no pet.) (mem. op.) (finding evidence legally insufficient where there was no disruption or impact on plaintiff's daily life, no high degree of mental distress, no required medical attention, and no witness corroboration of outward manifestations of mental feelings). We conclude that such evidence is legally sufficient to support the existence of compensable mental anguish. *See Hancock*, 400 S.W.3d at 59; *Champion Printing & Copying LLC v. Nichols*, No. 03-15-00704-CV, 2017 WL 3585213, at *4–5 (Tex. App.—Austin Aug. 18,

21

2017, pet. denied) (mem. op.); *Scott v. Christian Methodist Episcopal Church*, No. 02-10-00434-CV, 2012 WL 42991, at *4–5 (Tex. App.—Fort Worth Jan. 5, 2012, no pet.) (mem. op.).

However, given that there is little evidence about the duration and severity of Grebe's mental anguish and associated physical symptoms, and there is some evidence indicating that at least a part of his anguish was the result of his termination and predated his receipt of the boxes, we conclude that the amount of $250,000 is excessive and thus not supported by factually sufficient evidence. *See Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (although jury has discretion in determining amount of mental-anguish damages to award, such discretion is not unlimited, jury may not "simply pick a number and put it in the blank," and amount must be supported by evidence that amount is fair and reasonable); *Scott*, 2012 WL 42991, at *2, 5 (noting that under factual-sufficiency standard, courts review mental-anguish award to determine whether it fairly and reasonably compensates plaintiff or whether evidence supporting award is so weak or contrary to overwhelming weight of evidence as to make award excessive). The supreme court has recognized that each case is unique, but nonetheless "reasonable guideposts" govern any review of a mental-anguish award. *Anderson*, 550 S.W.3d at 619. As guideposts, this Court and our sister courts have upheld awards for past mental-anguish awards between $20,000 and $100,000 in cases with evidence of comparable or worse symptoms and manifestation of mental anguish as those here. *See, e.g.*, *Champion Printing*, 2017 WL 3585213, at *4–5 ($20,000 award); *Memon v. Shaik*, 401 S.W.3d 407, 419–20 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ($100,000 award); *Cullum v. White*, 399 S.W.3d 173, (Tex. App.—San Antonio 2011, pet. denied) ($50,000 award); *Lambert v. Lambert*, No. 05-08-00397-CV, 2009 WL 1493009, at *4, 7 (Tex. App.—Dallas May 29, 2009, no pet.) (mem. op.) ($75,000 award); *Beaumont v. Basham*, 205 S.W.3d 608, 617–18 (Tex.

22

App.—Waco 2006, pet. denied) ($100,000 award). We conclude that an award of $100,000 would fairly and reasonably compensate Grebe for the past mental anguish he suffered and will consider this amount when reviewing whether the TTLA exemplary-damage award is unconstitutionally excessive.

### *Exemplary damages*

In its third and fourth issues, respectively, New Horizons contends that the exemplary-damage awards of (a) $200,000 under the TTLA and (b) $500,000 for IIED are unconstitutionally excessive and violate its due-process rights. Because we have determined that Grebe was legally barred from obtaining damages on his IIED claim, we need not address New Horizons' fourth issue and address only its challenge to the TTLA exemplary damages. *See* Tex. R. App. P. 47.1.

A party may challenge an assessment of exemplary damages on federal due-process grounds even if the assessment is not deemed excessive under governing state law. *See Owens–Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex. 1998) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996)). When considering such a challenge, there are three "guideposts" for reviewing courts: (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages awarded, and (3) a comparison of the punitive damages awarded and other civil or criminal penalties that could be imposed for similar misconduct. *See State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *Gore*, 517 U.S. at 575). While there is no bright-line limit on exemplary damages and courts should consider these three guideposts in determining whether an award is excessive, "in practice, few awards exceeding a single-digit

ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *See id.* at 419. Each of the three *Gore* guideposts must be reviewed de novo to ensure that exemplary damages are not "grossly disproportional" to the gravity of the defendant's conduct, and the three guideposts work together to ensure that exemplary damages are "reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004) (per curiam).

We begin with the first *Gore* guidepost—the degree of reprehensibility of New Horizons' conduct. This guidepost is focused on the "enormity" of the misconduct and is "the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. *Gore* elaborated five nonexclusive factors that bear on the enormity of the misconduct: whether (1) the harm inflicted was physical rather than economic; (2) the tortious conduct showed "an indifference to or a reckless disregard for the health or safety of others"; (3) "the target of the conduct had financial vulnerability"; (4) "the conduct involved repeated actions," not just "an isolated incident"; and (5) the harm resulted from "intentional malice, trickery, or deceit," as opposed to "mere accident." *See id.* at 576–77. Courts presume that a plaintiff has been made whole for his injuries by compensatory damages, but nonetheless exemplary damages are permitted if the wrongdoing "is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Bennett v. Reynolds*, 315 S.W.3d 867, 874 (Tex. 2010) (citing *State Farm*, 538 U.S. at 419).

The jury obviously found New Horizons' conduct repugnant and reprehensible, and we conclude that each of the five above factors supports a high level of reprehensibility. As for the first, the harm inflicted on Grebe was not merely economic but also presented as physical manifestations of the emotional distress he experienced. *See Lambert*, 2009 WL 1493009, at *4,

24

7 (concluding that harm inflicted on plaintiff whose home was burglarized by ex-husband, who also left notes for plaintiff in home, was not merely economic when evidence showed that incident caused her to experience hair loss, weight gain, teeth-grinding and gum damage, loss of sleep, nightmares, fatigue, and depression). He exhibited physical and mental symptoms after discovering that his beloved possessions had been intentionally destroyed or mishandled, including a racing heart, hives, difficulty breathing, weight loss, panic attacks, insomnia, and nightmares. The evidence under this factor leans towards viewing New Horizons' conduct as more reprehensible than not. *See id.* at *4 (determining that ex-husband's breaking into ex-wife's home; taking her personal belongings, including family photographs and videos; and leaving notes for her in house was "reprehensible enough to justify a substantial award of exemplary damages").

The second factor—whether New Horizons' conduct evinced an indifference or reckless disregard for others' health or safety—also supports a high level of reprehensibility. The evidence and the jury's finding that New Horizons acted with actual malice and intended to cause Grebe emotional distress support the reasonable inference that New Horizons knew about the sentimental significance of the items to Grebe—some of which had been one-of-a-kind ceramics given to him by his deceased mother—and likely knew that their destruction would affect him deeply on an emotional level and thus affect his mental health. Additionally, the jury could have inferred that New Horizons acted with indifference or a reckless disregard for the health and safety of Grebe and his family by delivering to him a box with a dead animal and rat feces inside, as these pose a hazard to human health and safety. The third factor also weighs in favor of the exemplary-damage award. There was evidence that Grebe was financially vulnerable: he had been unemployed for at least six months, during which time he could not

25

afford to pay a therapist for the mental-health support that he needed; and his wife ceased working at New Horizons a few months after he was terminated.

As for the fourth factor—whether the conduct involved repeated actions or was an isolated incident—we conclude that it, too, supports the exemplary-damage award. The Texas Supreme Court has determined that this factor refers to "repeated, recidivist acts" rather than to a course of conduct that results in a single harm or injury. *See Reynolds*, 315 S.W.3d at 878 n.55. Evidence showed that New Horizons both packed up and transported Grebe's belongings— even those for which there could have been no reasonable dispute as to Grebe's ownership—on more than one occasion. New Horizons delivered Grebe's belongings to him, destroyed, in a piecemeal fashion over several dates and had never returned other items as of trial (more than six years after his termination). New Horizons refused Grebe's repeated demands for the return of his items over several months, depriving him of the use and enjoyment of his property during that time. Grebe's log of his damaged or destroyed belongings contained descriptions of over fifty items. The jury appears to have found that New Horizons sorted, packaged, stored, and shipped each of those fifty-plus items with malicious intent. Evidence also showed that New Horizons prevented Grebe's wife from retrieving his belongings even though she worked in an adjacent office. We conclude that this factor supports the exemplary-damage award because the evidence exhibits repeated, reprehensible acts by New Horizons that caused Grebe numerous injuries in the form of each item of personal property damaged, destroyed, or never returned plus his loss of use and enjoyment of those items for several months.

As for the fifth factor, as already mentioned the jury found—and the evidence supports such finding—that New Horizons acted with actual malice, meaning (as defined in the charge) that it acted with ill will or evil motive. We cannot say such finding is unsupported. The

26

jury appears to have found not credible the testimony of the New Horizons employees about the care with which they claimed to have packed Grebe's belongings and their attempts to shift the blame onto UPS. Instead, the jury appears to have viewed the evidence as showing that New Horizons acted out of spite or with ill and evil intentions to harm Grebe and "get to him," as Grebe believed was the case. The evidence supporting such scenario included the photos of the boxes as received, Grebe's testimony, the inclusion in the boxes of the dead bird and rodent feces, the inconsistencies between the New Horizons employees' testimony and the photos, New Horizons' transport of most of Grebe's items (including those clearly belonging to him, like the framed photo of his wife) to Abilene and then shipping them rather than leaving them in Goldthwaite, and New Horizons' suspicions about Grebe's purported fundraising improprieties and its actions taken in response thereto. The evidence allowed the jury to conclude that the damage to Grebe's beloved possessions was not an accident. This factor weighs strongly in favor of a high degree of reprehensibility.

We next turn to the second *Gore* guidepost: the ratio between actual or potential harm to the plaintiff on the one hand and exemplary damages on the other. The correct ratio for review purposes must take into account not only the actual damages the judgment awarded Grebe but the amount of actual harm that he suffered, necessarily including the sentimental value of his belongings and his past mental anguish. *See Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 891 n.47 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.) (noting that "extensive damages" presented by plaintiff that were not submitted to jury through "narrow lost profits issue" nonetheless were "relevant to exemplary damages because they represent actual harm suffered by" plaintiff); *see also Bennett v. Grant* (*Bennett II*), 525 S.W.3d 642, 651–52 (Tex. 2017) (noting that in evaluating second guidepost, appellate courts

27

may consider not only actual damages (i.e., "the harm that has likely occurred") but also "the harm likely to result from the defendant's conduct"). *Cf. Harris v. Archer*, 134 S.W.3d 411, 438 (Tex. App.—Amarillo 2004, pet. denied) (noting that potential damages were not in consideration for second guidepost under facts because evidence showed there were no further damages that could have occurred, and damages were easily calculated and not difficult to determine or detect). Although Grebe is legally barred from receiving damages for his IIED claim, he nonetheless suffered, as found by the jury, actual harm in the form of past mental anguish, $100,000 of which harm is supported by legally and factually sufficient evidence, as discussed above. When considering the sum of (a) the market-value damages ($4,790), (b) the sentimental-value damages ($26,750), and (c) the $100,000 of past mental-anguish damages we have determined are fair and reasonable on this record (and excluding the $250,000 in future mental-anguish damages, for which we have determined there is no evidence), the ratio between the $200,000 in exemplary damages and the damages sum is less than 1.5:1. This guidepost weighs in favor of the statutorily capped exemplary-damages award not being excessive.

Lastly, we turn to the final *Gore* guidepost: comparison of the exemplary damages awarded with other civil or criminal penalties that could be imposed for similar conduct. Although there is no analogous civil penalty, we note that the comparable criminal penalty for theft of amounts between $2,500 and $30,000—a state jail felony—is confinement for not more than two years and not less than 180 days and a fine not to exceed $10,000. *See* Tex. Pen. Code §§ 31.03(e)(4), 12.35(a), (b). While the maximum fine does not exceed the damages awarded, the loss of liberty that would result from a minimum of 180 days in state jail is a relatively high penalty for which no specific dollar figure can be placed. *See Reynolds*, 315 S.W.3d at 881 ("[I]ncarceration does not translate meaningfully to a dollar-figure fine.");

*Allstar Refinishing & Collision Ctr., Inc. v. Villalobos*, No. 11-14-00193-CV, 2016 WL 4719062, at *5 (Tex. App.—Eastland July 29, 2016, pet. denied) (mem. op.) ("While it is difficult, if not impossible, to reasonably compare a monetary penalty with any term of imprisonment, the Penal Code makes it clear that state-jail-felony theft is a serious offense."). We conclude that this guidepost supports the exemplary-damage award.

Grebe offered evidence that New Horizons' conduct warranted the imposition of exemplary damages, and the jury found the evidence to be clear and convincing. Having considered the *Gore* guideposts, we conclude that the exemplary-damage award of $200,000 is not unconstitutionally excessive. We overrule New Horizons' fourth issue.

### Attorney's fees

In its fifth and final issue, New Horizons argues that the trial court erred in awarding Grebe his attorney's fees because he failed to segregate between claims for which attorney's fees are recoverable and those for which they are not, a requirement to obtain attorney's fees. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006). However, an exception exists for when the fees are based on claims arising out of the same transaction that are so intertwined and inseparable as to make segregation impossible. *Id.* at 313–14. When discrete legal services advance both a recoverable and unrecoverable claim, they are sufficiently intertwined as to not require segregation. *Id.*

Attorneys are not required to keep separate records documenting the exact amount of time working on one recoverable claim versus an unrecoverable claim. *See id.* at 314. Segregation is sufficiently established if, for example, an attorney testifies that a given percentage of the drafting time would have been necessary even if the claim for which attorney's

29

fees are unrecoverable had not been asserted. *Id.*; *see also, e.g.*, *Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997) (noting that claimant's attorney "testified that approximately twenty-five percent of his time and fifteen-percent of his paralegal's time concerned issues predating the agreed judgment"); *Bennett v. Grant* (*Bennett I*), 460 S.W.3d 220, 242–43 (Tex. App.—Austin 2015) (concluding that testimony that 95% of work performed on case was for both claims at issue and would have been performed regardless of whether claim had been pursued for which recovery was not available was sufficient to support segregation duty), *rev'd in part on other grounds*, 525 S.W.3d 642 (Tex. 2017); *Alief Indep. Sch. Dist. v. Perry*, 440 S.W.3d 228, 246 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (attorney's testimony that less than ten percent of attorney time spent in case related solely to claims that were non-suited before trial and thus his subtraction of ten percent of fees was sufficient to support award); *Medical Specialist Grp., P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 738 (Tex. App.—Corpus Christi–Edinburg 2005, pet. denied) ("In his affidavit, Radiology Associates' counsel . . . testified that his fees for the defense of the case totaled $460,087.00, and approximately forty percent of those fees were directly related to Saratoga's antitrust claims."); *Flagship Hotel, Ltd. v. City of Galveston*, 117 S.W.3d 552, 565 & n.7 (Tex. App.—Texarkana 2003, pet. denied) ("[S]egregated attorney's fees can be established with evidence of unsegregated attorney's fees and a rough percent of the amount attributable to the breach of contract claim.").

Here, Grebe's counsel, Gary Werley, testified that $87,261 in attorney's fees was incurred as a result of 365 hours of reasonable and necessary legal work prior to, but not including, trial. This amount did not include the two weeks of trial preparation or the trial itself. Werley further testified that, based on his reviewing the billing entries and considering the

causes of action in the case, fifty percent—about $43,000—was the reasonable and necessary amount of fees incurred for Grebe's TTLA claim, which he believed was a "more than fair" amount. In making such computation, Werley deducted "in his head" the time spent defending against New Horizons' claims. Werley stated that most of the time spent by Grebe's attorneys in this litigation was on the conversion and TTLA claims, which he said are essentially the same claims—"really combined in their element[s]"—and it can be "hard to separate some of these things." Additionally, even though his firm spent a lot of time defending against the counterclaims, he did not bill for the time he spent researching those.

Guided by analogous caselaw in which courts, including the Texas Supreme Court, have concluded that an attorney's testimony about the approximate percentage of time spent on recoverable claims or on work that related to unrecoverable claims but would have been performed even if such claims had not been present in the case, we conclude that Grebe's evidence constituted sufficient segregation of attorney's fees. *See, e.g.*, *Chapa*, 212 S.W.3d at 314; *Bennett I*, 460 S.W.3d at 242–43. We overrule New Horizons' fifth issue.

**CONCLUSION**

We have determined that the trial court erred in denying New Horizons' motion to disregard the jury's findings on Grebe's IIED claim. Accordingly, we reverse and render a take-nothing judgment on Grebe's IIED claim and modify the judgment to delete the $250,000 awarded to Grebe for past mental anguish, the $250,000 awarded for future mental anguish, and the $500,000 awarded for exemplary damages related to the IIED claim. We affirm the judgment's remaining awards of $4,790 for stolen, damaged, and destroyed property; $200,000 in exemplary damages for Grebe's TTLA claim; and $43,000 for Grebe's attorney's fees.

31

_____

Karin Crump, Justice

Before Justices Triana, Kelly, and Crump

Affirmed in Part; Reversed and Rendered in Part

Filed:   February 21, 2025